Benjamin J. Scrimshaw
Timothy J. Preso
Earthjustice
313 East Main Street
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699 | Phone
(406) 586-9695 | Fax
bscrimshaw@earthjustice.org
tpreso@earthjustice.org

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| SWAN VIEW COALITION and FRIENDS OF THE WILD SWAN, <br><br> Plaintiffs, <br><br> vs. <br><br> DEBRA HAALAND, Secretary of the Interior; MARTHA WILLIAMS, Director of the U.S. Fish and Wildlife Service; and U.S. FISH AND WILDLIFE SERVICE, <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Plaintiffs in this case challenge the U.S. Fish and Wildlife Service's

("FWS") February 16, 2022 Biological Opinion ("Revised Biological Opinion")

for the U.S. Forest Service's 2018 Land Management Plan for the Flathead

National Forest ("Revised Forest Plan").  FWS's Revised Biological Opinion

failed to lawfully examine the Revised Forest Plan's abandonment of key habitat

protections for threatened grizzly bears and bull trout and inadequately responded

to the Endangered Species Act ("ESA") violations identified by the U.S. District

Court for the District of Montana in its June 24, 2021 summary judgement order

regarding the Revised Forest Plan.  See WildEarth Guardians v. Steele, No. CV 19-

56-M-DWM, 2021 WL 2590143 (D. Mont. June 24, 2021) ("Order").

2.      The Flathead National Forest includes 2.4 million acres of public land

in northwest Montana.  It has long provided a sanctuary for threatened grizzly

bears and bull trout in the Northern Rockies.  However, the Flathead's value to

these species depends in large part on the fact that much of the Forest has remained

relatively free of roads, and the human intrusion and sediment pollution that roads

engender.

3.      Under longstanding Flathead National Forest Plan direction, the

Forest Service was required to limit the number of roads and to reclaim excess

roads in grizzly bear and bull trout habitat.  Further, the Forest Service was

required to compensate for any new roads it built by fully reclaiming other roads in

the Forest according to stringent measures such that they no longer existed on the

landscape and motorized use was precluded, thus ensuring no net increase in the

total number of roads, and associated wildlife disturbance, in the Flathead.

4.     The 2018 Revised Forest Plan substantially weakened the Flathead's road-management framework by moving the goal posts on what is required to "reclaim" a road.  Nevertheless, FWS asserted incorrectly that the 2018 Revised Forest Plan, which replaced former Forest Plan requirements, will substantially comply with prior road management standards going forward by maintaining on-the-ground habitat conditions that existed in 2011.  This assertion is misguided because the Revised Forest Plan no longer requires the Forest Service to obliterate roads from the landscape but instead allows the agency to block just the entrance of a road—leaving the remainder of the road intact on the landscape—before permitting new road construction elsewhere.

5.     These changes in the Flathead Forest's management direction threaten significant harm to both grizzly bears and bull trout in the Flathead.  The new roadbuilding and minimal road closures contemplated by the Revised Forest Plan and approved by the Revised Biological Opinion enable motor vehicle trespass on new and putatively closed roads, causing disturbance in formerly secure grizzly bear habitat.  Further, even if no motorized trespass occurs, research has shown that grizzly bears avoid roads—including roads no longer used by motorized vehicles—and therefore may be displaced from roaded habitat.  Such displacement harms grizzly bear reproduction and survival.  Roads also threaten bull trout habitat because roads generate sediment that pollutes formerly pristine bull trout

streams.  Culverts under abandoned roads can become a significant source of pollution when they inevitably clog and fail, causing erosion and sedimentation in adjacent waterways.

6.     In sum, the Revised Forest Plan fundamentally alters the regulatory landscape governing habitat for grizzly bears and bull trout in the Flathead National Forest, purporting to uphold key habitat requirements with one hand while undermining those same protections with the other.

7.     Under the Endangered Species Act ("ESA") and Administrative Procedure Act ("APA"), FWS was required to produce a biological opinion for the Revised Forest Plan that considers all relevant factors that may affect the conservation of grizzly bears and bull trout, including the impact of inadequate road reclamation and new roadbuilding, and then to determine based on this analysis whether the Revised Forest Plan will jeopardize the survival of these species.  For the second time, FWS has failed to meet these requirements.

8.     FWS originally issued a biological opinion addressing the Revised Forest Plan on November 22, 2017 ("Initial Biological Opinion"), concluding that the Plan would not jeopardize grizzly bears or bull trout.  However, on June 24, 2021, following a lawsuit filed by Swan View Coalition and Friends of the Wild Swan, the U.S. District Court for the District of Montana issued an order holding, in part, that FWS's inadequate analysis of adverse impacts to grizzly bears and bull

trout in its Initial Biological Opinion violated the ESA. This District remanded the biological opinion to FWS with instructions to fully consider the Revised Forest Plan's impacts on grizzly bears and bull trout.

9.     In response, FWS issued the Revised Flathead Biological Opinion on February 16, 2022. Instead of addressing the Initial Biological Opinion's inadequacies, the Revised Biological Opinion made minor and inadequate revisions to FWS's original, unlawful biological opinion. Most significantly, the Revised Biological Opinion again failed to rationally address the impacts of the Revised Forest Plan's new management direction on grizzly bears and bull trout. Thus, for the second time, FWS has greenlighted the Flathead's harmful new management direction without grappling with the adverse consequences of that decision for grizzly bears and bull trout, as governing law requires.

10.    To enforce the ESA and to protect bull trout and grizzly bears from the unexamined harms threatened by the Flathead's permissive new road-management standards—approved and supported by FWS's Revised Biological Opinion—Plaintiffs again turn to this Court for relief.

## JURISDICTION AND VENUE

11.    Plaintiffs bring this action pursuant to the ESA, 16 U.S.C. § 1531 et seq., and the APA, 5 U.S.C. § 706(2), which waive the defendants' sovereign immunity. This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C.

§ 1331 (federal question) and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.

12.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Plaintiffs Swan View Coalition and Friends of the Wild Swan reside in this District and the ESA violations alleged in this Complaint occurred in this District.  Venue is proper in the Missoula Division of this District because a substantial part of Plaintiffs' claims arose in Flathead County.  See Mont. Code Ann. § 25-2-125; see also Local Civ. R. 1.2(c)(5), 3.2(b).

## PARTIES

13.    Plaintiff Swan View Coalition is a non-profit conservation organization dedicated to conserving water quality and quiet, secure habitats for fish, wildlife, and people on the Flathead National Forest and greater Flathead River Basin.  The Coalition's office is in Kalispell, Flathead County, Montana.  The Coalition brings this action on its own behalf and on behalf of its adversely affected members.

14.    Plaintiff Friends of the Wild Swan is a non-profit organization with its principal place of business in Swan Lake, Lake County, Montana.  Friends of the Wild Swan is dedicated to the conservation of water quality, fish and wildlife habitat, and biological integrity of the Flathead National Forest.  Friends of the

Wild Swan brings this action on its own behalf and on behalf of its adversely affected members.

15.     All plaintiffs have long-standing interests in the preservation and recovery of grizzly bears and bull trout in the Northern Continental Divide Ecosystem, which encompasses the Flathead National Forest, both because they and their members place a high value on these species, and because the presence of grizzly bears and bull trout is essential to the healthy functioning of the ecosystem. Plaintiffs have been active in seeking to protect and recover grizzly bears and bull trout through a wide array of actions, including public outreach and education, scientific analysis, and advocacy intended to promote achievement of healthy ecosystem functioning in the region.

16.     The members of each of the Plaintiffs also use the Flathead National Forest for traditional activities and recreational pursuits, including hiking, camping, backpacking, wildlife viewing, and aesthetic enjoyment.  In so doing, Plaintiffs' members and staff seek to observe, photograph, and study grizzly bears and bull trout in their native habitat.  Plaintiffs derive aesthetic, recreational, scientific, inspirational, and other benefits from these activities.

17.     Supported by the challenged Revised Biological Opinion, the Revised Forest Plan will reduce opportunities for Plaintiffs' members to experience grizzly bears and bull trout in the wild in the Flathead National Forest, because new

management direction under the Forest Plan will degrade grizzly bear and bull trout habitat and displace these species from areas that Plaintiffs' members use to observe, photograph, and study them.  The legal violations alleged in this complaint therefore cause direct injury to the aesthetic, conservation, recreational, scientific, educational, inspirational, and wildlife preservation interests of Plaintiffs and their members.

18.     Plaintiffs' aesthetic, conservation, recreational, scientific, educational, inspirational, and wildlife preservation interests have been, are being, and, unless the relief prayed for in this Complaint is granted, will continue to be adversely and irreparably injured by Defendants' failure to comply with federal law.  These are actual, concrete injuries, traceable to Defendants' conduct, which would be redressed by the requested relief.  Plaintiffs have no adequate remedy at law.

19.     Defendant Debra Haaland is the U.S. Secretary of the Interior.  In that capacity, Defendant Haaland has supervisory responsibility over FWS.  The Secretary of the Interior is the federal official vested with responsibility for properly carrying out the ESA with respect to terrestrial mammals such as grizzly bears and freshwater fish such as bull trout.  Defendant Haaland is sued in her official capacity.

20.     Defendant Martha Williams is the Director of the U.S. Fish and Wildlife Service.  In that capacity, Defendant Williams has supervisory

responsibility over FWS and FWS's administration of the ESA.  Defendant

Williams is sued in her official capacity.

21.     Defendant FWS is a federal agency within the Department of the

Interior.  FWS is responsible for administering the ESA with respect to terrestrial

wildlife such as grizzly bears and freshwater fish such as bull trout.

## LEGAL BACKGROUND

## I.    ENDANGERED SPECIES ACT

22.     "The ESA is 'the most comprehensive legislation for the preservation

of endangered species ever enacted by any nation.'  It represents a commitment 'to

halt and reverse the trend toward species extinction, whatever the cost.'"  Ctr. for

Biological Diversity v. Zinke, 900 F.3d 1053, 1059 (9th Cir. 2018) (quoting Tenn.

Valley Auth. v. Hill, 437 U.S. 153, 180, 184 (1978)) (internal citation omitted).

23.     To that end, section 7(a)(2) of the Act imposes on federal agencies

such as the Forest Service a duty to ensure that actions they authorize or carry out

are not likely to jeopardize endangered or threatened species or destroy or

adversely modify critical habitat designated for such species.  16 U.S.C. §

1536(a)(2).  An agency action "jeopardizes" a protected species if it "reasonably

would be expected, directly or indirectly," to reduce appreciably the species'

likelihood of survival and recovery "by reducing the reproduction, numbers, or

distribution of that species."  50 C.F.R. § 402.02; see Nat'l Wildlife Fed'n v. Nat'l

Marine Fisheries Serv., 524 F.3d 917, 932 (9th Cir. 2008).

24.     Before undertaking or authorizing an action that may affect ESA-

listed species or their critical habitat, the Forest Service must consult with the

appropriate expert fish and wildlife agency, which is FWS in the case of grizzly

bears and bull trout.  See 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.01(b).  The

formal consultation process culminates in FWS's issuance of a biological opinion,

reflecting FWS's determination—based on "the best scientific and commercial

data available"—of whether the proposed action will jeopardize a listed species or

destroy or adversely modify designated critical habitat.  16 U.S.C. § 1536(a)(2),

(b)(3)(A); see 50 C.F.R. § 402.14.  In making that determination, FWS must

"consider[ ] the relevant factors and articulate[ ] a rational connection between the

facts found and the choice made."  Ctr. for Biological Diversity v. BLM, 698 F.3d

1101, 1121 (9th Cir. 2012) (quotation omitted).

25.     If FWS concludes that a proposed action is likely to jeopardize a listed

species, the action may not proceed.  See 16 U.S.C. § 1536(a)(2).  FWS must

determine whether "reasonable and prudent alternatives" exist that would avoid

jeopardy.  Id. § 1536(b)(3)(A).

26.     If FWS concludes that implementing a proposed action (or a

reasonable and prudent alternative) will not jeopardize a protected species but will

nevertheless result in "take" of such species, the agency must issue an incidental take statement with its biological opinion.  50 C.F.R. § 402.14(i)(1).  Under the ESA, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a protected species "or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  Sections 9 and 10 of the ESA prohibit the taking of endangered species unless specifically authorized in an incidental take statement.  Id. §§ 1538(a)(1)(B), 1539.  ESA regulations extend this prohibition to threatened species such as the grizzly bear and bull trout.  See 50 C.F.R. §§ 17.40(b), 17.44(w) (regulations concerning take of grizzly bears and bull trout).

### THREATENED GRIZZLY BEARS

27.     The grizzly bear, Ursus arctos horribilis, once numbered roughly 50,000 individuals in the western United States.  Before European-American settlement of the American West, grizzly bears roamed from the Great Plains to the Pacific coast, inhabiting all but the hottest and most arid desert lands.  Grizzlies fed on bison carcasses in the Great Plains and beached whales on the Pacific coast. They played central roles in the functioning of a wide variety of ecosystems as well as in the cultural and spiritual beliefs and practices of many native peoples. With European-American settlement, however, grizzlies were "shot, poisoned, and trapped wherever they were found," eliminating them from all but mountain redoubts far removed from human intolerance.  Crow Indian Tribe v. United

11

States, 343 F. Supp. 3d 999, 1004 (D. Mont. 2018) (quotation omitted), aff'd in part, 965 F.3d 662 (9th Cir. 2020).

28.     In an historical blink of an eye, humans reduced the range of grizzly bears by more than 98 percent, isolating the remaining bears in a few remnant islands of wild country.  By the 1930s, the grizzly bear population in the continental United States had plummeted to fewer than 1,000 individuals. Recognizing the imperiled status of the species, FWS listed grizzly bears throughout the lower-48 United States as a threatened species under the ESA in 1975, two years after the Act was passed.  Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species, 40 Fed. Reg. 31,734 (July 28, 1975).

29.     Conservation efforts under the ESA have helped bring grizzly bears back from the brink, but the species remains confined to a few isolated populations in the northwest United States.  One of these remnant populations occurs in the Northern Continental Divide Ecosystem of northwest Montana.

30.     The Flathead National Forest, which encompasses 2.4 million acres of public land in northwest Montana, makes up a significant portion of the Northern Continental Divide Ecosystem and provides important habitat for grizzly bears.

31.     The value of that habitat, however, hinges on the fact that much of the Flathead has remained a largely unroaded landscape.  Roads—and the motor

vehicle and human intrusion those roads allow—are one of the principal threats that grizzly bears continue to face in the Northern Rockies today.  As seminal research by Richard Mace and Timothy Manley in the 1990s demonstrated, the presence of roads in grizzly bear habitat negatively impacts bears' survival.  This is because grizzly bears avoid roads, adjusting "their habitat use patterns in part" according to the density of roads in an area.  Mace & Manley, South Fork Flathead River Grizzly Bear Project:  Progress Report for 1992, at 25 (Apr. 1993) ("Mace & Manley 1993").  Researchers even observed bear "avoidance of high total road densities areas" where "roads were closed to public travel."  Mace & Waller, Final Report:  Grizzly Bear Ecology in the Swan Mountains, Montana, at 72-73 (1997).  FWS itself acknowledged in an earlier biological opinion analyzing some of this research that bears encountering vehicles, vehicle noise, and human noise associated with roads "learn to avoid the disturbance and annoyance generated by roads," and "may not change this resultant avoidance behavior for long periods after road closures and lack of negative reinforcement."  FWS, Biological Opinion on Amendment 19 to the Flathead National Forest Plan, at 15 (Jan. 6, 1995).  Mace and Manley concluded that their findings concerning bear avoidance of roaded areas "suggest that if unroaded habitats are reduced in quantity or size, the number of adult females will eventually decline," thus harming the grizzly bear population. Mace & Manley 1993 at 26.

32.     In response to this research and a public campaign to protect grizzly

bears from the threat of human intrusion, in 1995 the Forest Service issued Forest

Plan Amendment 19 for the Flathead National Forest.  This Amendment set limits

on the density of roads—that is, the miles of road length per square mile of

Forest—allowed in key grizzly bear habitat.  Specifically, Amendment 19 allowed

"no net increase in total motorized access density greater than 2 miles per square

mile" and "no net increase in open motorized access density greater than 1 mile per

square mile" in bear management subunits throughout the Forest.[1]  Flathead

National Forest, Forest Plan Amendment #19, Decision Notice, at 4 (Mar. 1995)

("Amendment 19 Decision Notice").  Further, Amendment 19 required the Forest

Service to "limit high-density (> 1 mile/square mile) open motorized access to no

more than 19 percent" of a bear management subunit "within 5 years" and "limit

high-density (> 2 miles/square mile) total motorized access to … no more than 19

percent in 10 years."  Id.  Total motorized access density includes all roads that

have not been fully reclaimed, while open motorized access density includes all

roads that are open to public use during times of year when grizzly bears are active

and out of their dens.  Flathead National Forest, Forest Plan Amendment #19,

---

[1] A bear management subunit is a subdivision of the Northern Continental Divide
Ecosystem "representing the approximate size of an average annual female grizzly
bear home range."  Revised Forest Plan at 172.

Amended Environmental Assessment, app. D at 2-3 (Mar. 1995) ("Amendment 19 EA").

33.     At the time the Forest Service issued Amendment 19, many Flathead Forest bear management subunits did not meet these road density standards. Amendment 19 thus required the Forest Service to reclaim existing roads in these areas.  Further, to meet Amendment 19's no-net-increase standard, Amendment 19 required the Forest Service to compensate for any new road construction by reclaiming existing roads elsewhere in the same bear management subunit.  Under Amendment 19, such reclaimed roads could be excluded from total motorized access density calculations only if they met stringent requirements: at a minimum, the Service had to treat the first 200 to 600 feet of the road "to preclude its use as a motorized or non-motorized travel way"; treat the remainder of the road to discourage its use as a motorized or non-motorized travelway; and remove all stream-aligned culverts under the road.  Amendment 19 EA, app. D at 2.  Such treatment was to make the reclaimed road "no longer function as a road or trail." Id.

34.     These stringent reclamation requirements are essential to ensuring that habitat in the Flathead remains secure for grizzly bears.  As discussed, grizzly bears are displaced from roaded areas even if the roads are unused, and that displacement can impair the bears' ability to survive and reproduce.  Therefore,

15

new roads—even if administratively closed—will continue to harm grizzly bears until they are fully removed from the landscape, as Amendment 19 required.

## THREATENED BULL TROUT

35.     The bull trout, Salvelinus confluentus, is a migratory char (a close relative of trout) in the salmonid family.  Historically, bull trout thrived in major river drainages from northern California and Nevada north to Alaska, and from Puget Sound on the Pacific coast east to Montana and Alberta.

36.     FWS listed bull trout across the lower-48 United States as a threatened species under the ESA in 1999.  By the time of the listing decision, bull trout had been extirpated from approximately 60 percent of their historic range. In 2010, FWS designated critical habitat for bull trout, which included many creeks and other watersheds within and downstream from the Flathead National Forest.  See Final Rule, Revised Designation of Critical Habitat for Bull Trout in the Coterminous United States, 75 Fed. Reg. 63,898 (Oct. 18, 2010).

37.     The coterminous United States population of bull trout comprises 109 occupied core areas, each of which plays an important role in the conservation of the species.  In 2005, even with ESA protections in place, FWS concluded that approximately 72 percent of bull trout core area populations were at risk or at high risk of extirpation.  In its 2005 analysis, FWS determined that just 3.3 percent of core area populations across the species' range were at low risk of extirpation.

38.     As described by FWS, "a wide variety of factors" threaten bull trout across their range, including habitat degradation and fragmentation; reduced stream flows; road construction and maintenance, mining, and grazing activities; blockage of migratory corridors by dams and other structures; poor water quality; competition with and predation by nonnative fish species; intentional or incidental killing of bull trout by anglers; and climate change.  Revised Biological Opinion at II-5–6.

39.     Habitat loss is one of "the most significant primary threat factors affecting bull trout."  FWS, Recovery Plan for the Coterminous United States Population of Bull Trout, at iv (2015) ("Bull Trout Recovery Plan").  Compared to other salmonid fish species, "bull trout generally have the most specific habitat requirements":  To spawn, develop, and survive, bull trout need water that is very cold and clean.  Id.

40.     Sediment, for example, can impair the species' reproduction if it pollutes bull trout streams:

> When fine sediments enter streams at levels beyond natural background conditions, they can accumulate within spawning gravels and reduce survival of eggs and embryos (Pratt 1992) by impairing their access to oxygenated water, as well as negatively affecting juveniles and adults by interfering with foraging, clogging gills, physically abrading tissues, and disrupting orientation and movement patterns.

Id. at 26.  Sediment can also "lead to changes in channel morphology and water temperature," Revised Flathead Biological Opinion at II-48, thus threatening to

17

render an impacted stream uninhabitable to bull trout, which have "extremely low tolerance for warm water temperatures." Bull Trout Recovery Plan at 26.

41.     Roads built in bull trout watersheds—including roads unused by motorized vehicles—remain a major source of harmful sediment for bull trout streams. "Sediment from the road system can be delivered to streams by direct erosion of cut and fill slopes associated with stream crossings or by surface runoff from roads and ditches that carries sediment-laden water directly or indirectly to streams." Revised Flathead Biological Opinion at II-48. Further, stream-aligned culverts supporting a road can trap debris and, over time, fail, causing the stream to run over the roadbed with associated erosion and sedimentation. As FWS has acknowledged, such culvert failure is inevitable if culverts are not removed: "Whatever the design life, any crossing structure would have a 100% chance of failure over its installation life if it is not removed after the road is abandoned." FWS, Biological Opinion on the Effects of the Moose Post-Fire Project on Bull Trout, at 40 (Nov. 14, 2002). Addressing the threat of sedimentation from roads therefore requires, according to FWS, "maintaining bridges, culverts, and [stream] crossings" and "decommissioning surplus roads and removing culverts and bridges on closed roads." Bull Trout Recovery Plan at 26.

42.     Until recently, Amendment 19 required the Forest Service to do just that: as discussed, the Amendment limited the number of roads in the Flathead and

further required the Forest Service to reclaim roads in grizzly bear habitat throughout the Forest.  In the process, the Forest Service would remove culverts under the reclaimed roads, thus preventing catastrophic culvert failure in bull trout watersheds.  Road management under Amendment 19 thus helped to mitigate the threat sediment pollution poses to bull trout and their critical habitat.  Accordingly, although Amendment 19's primary purpose was to protect grizzly bears, FWS has also concluded that the Amendment 19 standards help to conserve bull trout and other fish species in the Forest.

## THE REVISED FOREST PLAN AND UNLAWFUL REVISED BIOLOGICAL OPINION

43.     The Flathead National Forest approved its Revised Forest Plan on December 27, 2018.  The Revised Forest Plan replaced the 1986 Flathead Forest Plan and its amendments, including Amendment 19, and will provide management direction for the Forest for at least the next fifteen years.

44.     Before issuing the Revised Forest Plan, the Forest Service consulted with FWS pursuant to the ESA about the Plan's impacts on grizzly bears and bull trout, which resulted in FWS issuing its Initial Biological Opinion on November 22, 2017.  The Initial Biological Opinion concluded that the Revised Forest Plan's new management direction is not likely to jeopardize grizzly bears and bull trout or adversely modify bull trout critical habitat.

45.     FWS's conclusions about impacts to grizzly bears and bull trout relied on an assertion that the 2018 Revised Forest Plan will substantially comply with prior road management standards going forward by maintaining on-the-ground habitat conditions that existed in 2011.  However, the Revised Forest Plan's commitment to maintaining the 2011 baseline is illusory because the Revised Forest Plan moved the goal posts on what qualifies as a "reclaimed" road.  Under the Revised Forest Plan, "roads are not counted in the total motorized route density" as long as they are rendered "impassable."  Revised Forest Plan at 199. However, "impassable" roads, as defined by the Revised Forest Plan, are no such thing.  The Forest Service will deem a road "impassable" if "the first 50 to 300 feet … has been treated to make it inaccessible to wheeled motorized vehicles."  Id.  By the Forest Service's estimation, "natural vegetation growth, … scarified ground, fallen trees, boulders, or culvert or bridge removal" can be sufficient to meet this criterion.  Id.  Thus, under the Revised Forest Plan, the Forest Service may deem an existing road "impassable" (and thus build new roads) as long as the Service puts a minimal barrier across the first 50 feet of the road, such as fallen trees.

46.     By contrast, under Amendment 19, roads in grizzly bear habitat counted against maximum road-density requirements unless the Service fully reclaimed them by, at a minimum, treating the first 200 feet of the road "to preclude its use as a motorized or non-motorized travel way"; revegetating and

scattering debris on the remainder of the road; and removing all stream culverts under the road.  Amendment 19 EA, app. D at 2.   Removing stream culverts effectively eliminates the threat of motor vehicle trespass, because motor vehicles cannot practically navigate a road after the culverts have been taken out.

47.   Further, as to roadbuilding in bull trout habitat, the Revised Forest Plan replaced a formerly mandatory limit on new road construction throughout most of the Forest with a voluntary guideline of limited geographic scope that provides no meaningful protection for the region's struggling bull trout population. See Revised Forest Plan at 18 (providing that "net increases in stream crossing and road lengths should be avoided" in some bull trout watersheds).

48.   On April 15, 2019, Swan View Coalition and Friends of the Wild Swan filed a lawsuit in the U.S. District Court for the District of Montana challenging the Revised Flathead Forest Plan, the accompanying EIS, and FWS's Initial Biological Opinion.  The lawsuit alleged that FWS and the Forest Service failed to rationally consider impacts to grizzly bear and bull trout habitat from the Revised Forest Plan's new rules governing roads, because the agencies essentially assumed that the new rules would maintain the on-the-ground conditions that had prevailed under the prior, more protective management regime.  On June 24, 2021, this District issued an order holding, in part, that the agencies' inadequate analyses violated the ESA.  This District remanded the biological opinion to FWS with

instructions to fully consider the Revised Forest Plan's impacts on grizzly bears and bull trout.

49.     In response, FWS issued its Revised Flathead Biological Opinion on February 16, 2022.  The Revised Biological Opinion made only minor and inadequate revisions to the unlawful Initial Biological Opinion.  First, FWS's Revised Biological Opinion failed to meaningfully examine adverse impacts to grizzlies and bull trout from future unauthorized motorized use on roads closed under the Revised Forest Plan's weaker closure rules.  Second, FWS again failed to consider impacts to grizzly bear arising from the well-established fact that, even without unauthorized use, roads displace grizzly bears and deliver sediment to bull trout streams.  Third, FWS failed to consider that the Revised Forest Plan's relaxed rules would allow for increased roadbuilding by weakening road closure requirements.  Fourth, FWS acknowledged that the Revised Forest Plan's abandonment of culvert removal requirements when closing roads could "adversely affect bull trout and bull trout critical habitat," id. at II-53, and therefore mandated that the Forest Service "[r]emove all stream-aligned culverts when decommissioning roads" in some bull trout watersheds, id. at II-78; however, this requirement omitted important bull trout habitat and failed to recognize that the Revised Forest Plan proposes to close roads by rendering them "impassable" and not by "decommissioning" roads, and therefore allows the Forest Service to

remove roads from road-density calculations without removing stream-aligned culverts.

### A.   Unlawful Analysis of Impacts to Grizzly Bears

50.   FWS's analysis of impacts to grizzly bears in the Revised Biological Opinion rested on an illusory promise that the Forest Service would maintain existing road-density conditions in the Flathead.  FWS's Revised Biological Opinion incorrectly stated that the Revised Flathead Forest Plan will "require no net decrease to the 'baseline' … for secure core and no net increase to the baseline for open motorized route density or total motorized route density" that existed in 2011.  Revised Flathead Biological Opinion at III-6; see also Revised Forest Plan at 172 (defining "baseline" as conditions as of December 31, 2011).  According to FWS, this new management direction therefore will "maintain on-the-ground conditions that have contributed to the growth and expansion of the NCDE grizzly bear population."  Id. at III-67.  At the outset, the 2011 road-density baseline is less protective of grizzly bears than the prior Amendment 19 management regime because the Forest Service never attained the Amendment 19 road density limits in many parts of the Flathead.[2]  Moreover, as established, the Revised Forest Plan's commitment to maintaining even the less protective 2011 baseline is illusory

---

[2] The Forest Service would need to reclaim an additional 518 miles of roads to meet the Amendment 19 standards, an amount approaching the 730 miles the Forest Service has reclaimed to date.

because the Plan's minimal road closure requirements allow the Forest Service to substantially degrade on-the-ground baseline of road density in the Flathead Forest's grizzly bear habitat—enabling unlimited new road construction while permitting the Forest Service to retain "impassable" roads without increasing road-density calculations.

51.    FWS failed to grapple with the harmful consequences of this fundamental management change.  First, as the U.S. District Court for the District of Montana held in its June 24, 2021 Order, the minimal road closures adopted by the Revised Forest Plan frequently fail to prevent motor vehicle trespass on putatively closed roads, and motorized users can and do remove and bypass minimal physical barriers.  WildEarth Guardians, 2021 WL 2590143, at *868–69. Thus, this District held that "the Fish and Wildlife Service's failure to consider the effect of ineffective road closures [in its Initial Biological Opinion] was arbitrary and capricious" and violated the ESA.  Id. at *869.

52.    However, in issuing the Revised Biological Opinion, FWS again failed to meaningfully consider impacts to grizzly bears from unauthorized motorized use.  The Revised Biological Opinion's new analysis began by stating that FWS would not consider future unauthorized motorized use associated with ineffective road closures because such use is "not the result of a federal action and therefore not analyzed under effects of the action, but their influence is considered

for describing the environmental baseline." Revised Biological Opinion at III-46.

Nevertheless, FWS appeared to undertake a cursory review of adverse impacts to

grizzly bears from such unauthorized activity, ultimately concluding that future

unauthorized motor-vehicle use of roads closed by ineffective entrance barriers

would not harm grizzly bears because past levels of unauthorized use had not

caused grizzly bear populations to decline. Id. ("[T]he effects of any illegal

motorized access on the grizzly bear population is likely low as evidenced by the

NCDE grizzly bear population status…."). However, this conclusion failed to

recognize that the Revised Forest Plan's new direction will increase the number of

roads closed only by entrance barriers and will therefore yield an ever-increasing

mileage of roads susceptible to, and ultimately receiving, unauthorized motorized

use in grizzly bear habitat. In short, FWS irrationally assumed that future adverse

impacts to grizzly bears from ineffective road closures would mirror past

impacts—even while the Revised Forest Plan fundamentally altered and weakened

road closure requirements in the Flathead Forest's grizzly bear habitat.

53.     Additionally, by opening the door to new road construction without

requiring the Forest Service to compensate for new roads by fully reclaiming the

entirety of existing roads, the Revised Forest Plan threatens a severe impact to

grizzly bear habitat security. As researchers demonstrated more than twenty years

ago, even roads that do not receive motorized use threaten a detrimental impact to

grizzly bear survival, because grizzly bears are displaced from roaded habitat, regardless of whether the roads are open to or continue to receive public or administrative use.  The Revised Forest Plan, however, permits the Forest Service to leave ostensibly closed roads in place, and in fact contemplates that these roads will be stored in a condition that will allow quick future use.  See Revised Forest Plan at 199 ("Impassable roads may remain on the inventoried road system if use of the road is anticipated at some point in the future.").  Therefore, under the Revised Forest Plan, roads once "reclaimed" by the Forest Service to offset new road construction can instead remain on the landscape indefinitely and displace grizzly bears from their habitat long after the roads have been "closed."

54.     The FWS's Revised Biological Opinion on the Revised Forest Plan again failed to acknowledge the threat of new road proliferation and associated human disturbance of grizzly bear habitat that the Revised Forest Plan allows. Instead, FWS simply stated that the Revised Forest Plan will not cause jeopardy because it "will require projects to results [sic] in no net increase above baseline conditions in" open motorized route density and total motorized route density. Revised Flathead Biological Opinion at III-89.

55.     Although the management changes associated with the Forest Service's abandonment of Amendment 19 requirements were overlooked in the Revised Biological Opinion, their significant consequences for grizzly bear habitat

security are already becoming apparent in a series of proposed new project decisions under the Revised Forest Plan. While litigation over the Revised Forest Plan has proceeded, the Forest Service has advanced multiple projects that implement the Revised Forest Plan's challenged provisions and involve significant roadbuilding totaling more than <u>66 miles</u> of roads in grizzly bear habitat. The bulk of this roadbuilding involves just three projects, including the Mid-Swan (31.9 road miles), Bug Creek (13.3 road miles), and Frozen Moose projects (13 road miles). By contrast, under Amendment 19, only 3.2 miles of new roads were built in grizzly bear habitat on the Flathead National Forest from 1996 to 2010—and even this small amount was apparently offset by similar amounts of road reclamation, resulting in no net increase in total road density. The Revised Forest Plan facilitates and incentivizes this new level of roadbuilding by diminishing the stringency of the requirement for offsetting road reclamation, thereby making it easier and less costly for the Forest Service to undertake construction of new forest roads. The Forest Service's proposed onslaught of new roadbuilding under the Revised Forest Plan would result in a marked reduction in on-the-ground baseline grizzly bear security conditions, but the resulting impact to grizzly bears has escaped analysis under the ESA due to FWS's arbitrary approach in the Revised Biological Opinion.

**B.     Unlawful Analysis of Impacts to Bull Trout**

56.     FWS likewise failed to grapple with the Revised Forest Plan's

harmful consequences for bull trout habitat.  The Revised Forest Plan's

abandonment of Amendment 19 requirements threatens harm to bull trout habitat.

As discussed, former Forest Plan Amendment 19 required the Forest Service to

reclaim roads through stringent measures to meet road-density standards

throughout most of the Forest.  One of these reclamation requirements was to

remove all stream-aligned culverts from the reclaimed roads, so that orphaned

culverts in otherwise closed parts of the road system would not cause

sedimentation in streams.  Although Amendment 19's primary purpose was to

protect grizzly bears, its protective standards also helped to conserve bull trout in

the Forest.  Consistent with this conclusion, the 2015 Bull Trout Recovery Plan

stated that minimizing the threat of sedimentation "requires reduction of [road

construction and maintenance] or implementing best management practices" such

as "maintaining bridges, culverts and crossings" and "decommissioning surplus

roads and removing culverts and bridges on closed roads."  Bull Trout Recovery

Plan at 26.

57.     As described above, however, the Revised Forest Plan abandoned

Amendment 19's mandatory road-reclamation requirements, including the

requirement for culvert removal, thus subjecting bull trout to perpetual threats of

erosion and sedimentation when roads and road culverts remain on the Flathead landscape.  This District's June 24, 2021 opinion recognized this change and held that "[t]he scientific evidence does not support the Revised Plan's shift away from mandatory culvert removal, particularly since the Fish and Wildlife Service endorsed culvert removal as one of the most effective bull trout protection tools just two years prior to" issuing its Initial Flathead Biological Opinion in 2017. WildEarth Guardians, 2021 WL 2590143, at *869; see also, id. at *871 (holding that FWS's analysis regarding the "abandonment of the culvert removal requirement was arbitrary and capricious").

58.     In response, FWS's Revised Flathead Biological Opinion acknowledged that failing to remove culverts "has the potential to adversely affect bull trout and bull trout critical habitat."  Revised Biological Opinion at II-53.  As a result, FWS issued an incidental take statement accompanying the Revised Biological Opinion that required the Forest Service to "[r]emove all stream-aligned culverts when decommissioning roads in Conservation Watershed Network watersheds that have bull trout…."  Id. at II-78 (emphasis added).  However, FWS failed to recognize or acknowledge that the Revised Forest Plan contemplates that the Forest Service will remove roads from road-density calculations not by "decommissioning" them, but rather by rendering them "impassable," which is a distinct concept under the terms of the Revised Forest Plan.  See Revised Forest

Plan at 199 (defining "impassable" and "decommissioned" roads).  Importantly, while the Revised Forest Plan allows the Forest Service to remove "decommissioned" roads from road-density calculations "as long as they meet the definition of impassable," the converse is not true—there is no requirement that "impassable" roads also meet the definition of "decommissioned."  Id. (defining "decommissioned" to mean "[a]n unneeded road that has been stabilized and restored to a more natural state").  In short, the Forest Service may easily circumvent FWS' new culvert-removal requirement by rendering roads impassable (blocking the entrance) but not decommissioning (restoring them to a more natural state), thus allowing the Forest Service to remove roads from road-density calculations without removing stream-aligned culverts.  FWS's culvert-removal requirement therefore guarantees no protections for bull trout.  FWS failed to consider this significant limitation of its own prescribed new protection for bull trout habitat.

59.    FWS's new culvert-removal requirement is also insufficient because it applies only in the so-called "conservation watershed network."  This network excludes significant portions of designated critical bull trout habitat, including Swan Lake and the land surrounding it, the headwaters of Cyclone Creek, and portions of the Swan River and Flathead River watersheds.  Compare id., app. B at 2 (map of conservation watershed network) with Flathead National Forest,

Biological Assessment for Threatened, Endangered, and Proposed Species, at 332-335 (Oct. 31, 2017) (maps of bull trout critical habitat).  In short, FWS's inadequate culvert-removal requirement falls far short of addressing the ESA violation identified in this District's June 24, 2021 Order.

60.     Moreover, as with grizzly bears, FWS overlooked impacts to bull trout from the Revised Forest Plan's abandonment of Amendment 19's stringent road-reclamation requirements.  FWS's Revised Biological Opinion stated that the Revised Forest Plan's "direction for the conservation watershed network" does "not allow[] a net increase of road network in these watersheds."  Revised Biological Opinion at II-50 (emphasis added).  However, this assertion relied on a hortatory guideline that provides that "net increases in stream crossing and road lengths should be avoided," Revised Forest Plan at 18 (emphasis added).  As a Forest Plan "guideline" describing what the Service "should" do, this provision is not mandatory, both by definition and by its own terms.  See id. at 6 (defining "guideline").  Therefore, FWS was factually wrong to assert that the Revised Forest Plan does not allow increased road density in watersheds designated for fish conservation.  Moreover, as with the culvert removal requirement, this hortatory guideline applies only in the "conservation watershed network," which does not include significant designated critical bull trout habitat.

61.     As discussed for grizzly bears, the Revised Forest Plan allows for new roadbuilding—and new culvert installation—throughout most of the Forest as long as the Forest Service renders other roads "impassable" by placing a minimal barrier across just the entrance of those otherwise usable roads.  Final EIS, vol. 1, at 135.  That barrier will not prevent the unreclaimed roadbed from eroding, nor will it prevent culverts under the road from failing and releasing large amounts of sediment into bull trout habitat.  Further, because the Revised Biological Opinion's culvert-removal requirement includes a loophole that allows culverts to remain on impassable roads, this new requirement guarantees no protections for bull trout.  Finally, as discussed, FWS's Revised Biological Opinion failed to meaningfully consider that minimal barriers may allow motorized trespass on "impassable" roads, causing further sedimentation.

**FIRST CAUSE OF ACTION**

**(Violation of Endangered Species Act—
Failure to rationally address threats to grizzly bears)**

62.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

63.     Under the ESA, federal agencies are required to ensure that the actions they take will not jeopardize the survival of threatened grizzly bears.  16 U.S.C. § 1536(a)(2).  To meet this requirement, the action agency must consult with FWS about proposed actions that may adversely affect grizzly bears.  Id.; 50

C.F.R. § 402.14(a).  During the formal consultation process, FWS "must formulate
[a] biological opinion as to whether the action, taken together with cumulative
effects, is likely to jeopardize the continued existence of [the grizzly bear]."  Ctr.
for Biological Diversity v. BLM, 698 F.3d at 1107 (quotation and alteration
omitted).  FWS violates this obligation if it "fails to consider[ ] the relevant factors
and articulate a rational connection between the facts found and the choice made."
Id. at 1121 (quotation omitted) (alteration in original).

64.    The Revised Forest Plan weakened grizzly bear habitat protections by
allowing new roadbuilding throughout the Flathead National Forest, without
meaningful and permanent reclamation of other roads elsewhere in the Forest to
compensate for the new road construction.  This new management direction is a
significant departure from former Forest Plan Amendment 19, which required the
Forest Service to reclaim roads according to stringent requirements such that a
reclaimed road would "no longer function as a road or trail."  Amendment 19 EA,
app. D at 2.

65.    New roadbuilding in the Forest without meaningful reclamation to
ensure no net increase in the road system presents a significant threat to grizzly
bears, because motor vehicle users and other recreationists can trespass on the
supposedly "impassable" roads and thus encroach on grizzly bear habitat.  Further,
even unused roads cause detrimental impacts to grizzly bear survival and

reproduction, because grizzly bears are displaced from roaded habitat, regardless of whether the roads receive public or administrative use.  However, in concluding that the Revised Forest Plan will not jeopardize the species, FWS's Revised Biological Opinion failed to adequately examine adverse impacts to grizzly bears from unauthorized motorized use on roads closed according to the Revised Forest Plan's weaker closure standards; failed to consider the displacement impacts caused by roads even when they do not receive motorized use; and failed to account for increased roadbuilding enabled by the Forest Service's abandonment of stringent road-reclamation requirements.

66.     FWS thus failed to rationally determine, based on a consideration of all relevant factors, whether the Revised Forest Plan's new management direction will jeopardize the survival of grizzly bears in the Flathead.  See Ctr. for Biological Diversity v. BLM, 698 F.3d at 1121.

67.     FWS's Revised Biological Opinion is therefore arbitrary, capricious, and not in accordance with law, and should be set aside pursuant to the ESA and APA.  5 U.S.C. § 706(2).

## SECOND CAUSE OF ACTION

### (Violation of Endangered Species Act—
### Failure to rationally address threats to bull trout)

68.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

69.     Under the ESA, federal agencies are required to ensure that the actions they take will not jeopardize the survival of threatened bull trout or adversely modify their critical habitat.  16 U.S.C. § 1536(a)(2).  To meet this requirement, the action agency must consult with FWS about proposed actions that may adversely affect bull trout.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).  During the formal consultation process, FWS "must formulate [a] biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of [the bull trout]."  Ctr. for Biological Diversity v. BLM, 698 F.3d at 1107 (quotation and alteration omitted).  FWS violates this obligation if it "fails to consider[ ] the relevant factors and articulate a rational connection between the facts found and the choice made."  Id. at 1121. (quotation omitted) (alteration in original).

70.     The Revised Forest Plan weakened bull trout habitat protections by allowing new roadbuilding throughout the Flathead National Forest without meaningful reclamation of existing roads to compensate for the new road construction.  This new management direction is a significant departure from former Forest Plan Amendment 19, which required the Forest Service to reclaim roads according to stringent requirements such that a reclaimed road would "no longer function as a road."  Amendment 19 EA, app. D at 2.  Importantly for bull trout, the Revised Forest Plan does not require the Forest Service to remove

culverts from "impassable" roads.  Moreover, while FWS's Revised Biological Opinion purports to fill the protective void created by the Revised Forest Plan's abandonment of culvert-removal requirements for closed roads, FWS's culvert-removal mandate fails to guarantee any protections for bull trout because it is geographically limited and applies only to "decommissioned" rather than "impassable" roads.

71.     In lieu of Amendment 19's mandatory roadbuilding restrictions and reclamation requirements, the Revised Forest Plan set a hortatory guideline to limit roadbuilding and culvert installation in bull trout habitat.  This hortatory guideline threatens to allow significant new roadbuilding in bull trout habitat.

72.     New roadbuilding without meaningful reclamation to ensure no net increase in the road system threatens stream sedimentation that will degrade critical bull trout habitat.  Surface runoff on roads, including roads unused by motorized vehicles, threatens to cause sediment discharge to nearby waterbodies, including bull trout streams.  Culverts inevitably clog and fail, causing the affected stream to run over the roadbed with associated erosion and sedimentation.  Such sedimentation threatens to degrade stream conditions and harm bull trout, which require very cold and clean water to survive and reproduce.

73.     FWS's Biological Opinion did not acknowledge or analyze these potential impacts to bull trout in concluding that the Revised Forest Plan will not likely jeopardize bull trout or adversely modify bull trout critical habitat.

74.     FWS thus failed to rationally determine, based on a consideration of all relevant factors, whether the Revised Forest Plan's new management direction will jeopardize the survival of bull trout or adversely modify bull trout critical habitat in the Flathead.  See Ctr. for Biological Diversity v. BLM, 698 F.3d at 1121.

75.     The challenged Biological Opinion is therefore arbitrary, capricious, and not in accordance with law and should be set aside pursuant to the ESA and APA.  5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that FWS's Revised Biological Opinion violates the ESA and APA;

2.     Set aside and vacate the Revised Biological Opinion;

3.     Award Plaintiffs their reasonable fees, costs, and expenses, including attorney fees, associated with this litigation; and

4.     Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

37

Respectfully submitted this 31st day of May, 2022.

/s/ Benjamin J. Scrimshaw
Benjamin J. Scrimshaw
Timothy J. Preso
Earthjustice
313 East Main Street
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699 | Phone
(406) 586-9695 | Fax
bscrimshaw@earthjustice.org
tpreso@earthjustice.org

*Counsel for Plaintiffs*