IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| SWAN VIEW COALITION and FRIENDS OF THE SWAN,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>DEBRA HAALAND, Secretary of the Interior; MARTHA WILLIAMS, Director of the U.S. Fish and Wildlife Service; RANDY MOORE, Chief of the U.S. Forest Service, KURTIS STEELE, Forest Supervisor for the Flathead National Forest; U.S. FOREST SERVICE; and U.S. FISH AND WILDLIFE SERVICE,<br><br>　　　　　Defendants. | CV 22–96–M–DLC<br><br><br>ORDER |

Plaintiffs Swan View Coalition and Friends of the Wild Swan challenge the United States Fish and Wildlife Service's ("FWS") 2022 Revised Biological Opinion (the "Revised BiOp") for the Flathead National Forest's 2018 Revised Land Management Plan (the "Revised Forest Plan"). (Doc. 16.) United States Magistrate Judge Kathleen L. DeSoto has entered Findings and Recommendations on the parties' cross-motions for summary judgment (Docs. 26, 29), Defendants' Motion to Strike (Doc. 47), and Plaintiffs' Motion for Leave to File Third Hammer Declaration (Doc. 51). (Doc. 58.) Judge DeSoto recommends that the parties'

1

cross-motions be granted in part and denied in part, Defendants' motion to strike be denied, and Plaintiffs' motion for leave be granted.  (*Id.* at 45–46.)  Judge DeSoto further recommends that the Revised BiOp be remanded without vacatur for further consideration.  (*Id.*)

Both parties timely filed objections.  (Docs. 60, 61.)  Each party is therefore entitled to de novo review of those findings and recommendations to which it specifically objects.  28 U.S.C. § 636(b)(1)(C).  The Court reviews for clear error those findings and recommendations to which no party timely objects.  *See Thomas v. Arn*, 474 U.S. 140, 149 (1985); *McDonnell Douglas Corp. v. Commodore Bus. Machs., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981).  Clear error exists if the Court is left with a "definite and firm conviction that a mistake has been committed." *United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000).  For the reasons stated herein, the Court will adopt in part, modify in part, and reject in part Judge DeSoto's Findings and Recommendations.

FACTUAL AND PROCEDURAL BACKGROUND

## I.    The Flathead National Forest

The Flathead National Forest (the "Forest") is located in the northern Rocky Mountains of Western Montana and is comprised of approximately 2.4 million acres of public land, including wilderness areas, lands managed for timber production, lands interspersed with private development, and critical habitat for

2

threatened species.  USFWS_037154–55.  Within the Forest, there are five federally designated threatened species—bull trout, grizzly bear, Canada lynx, spalding's campion (or "catchfly"), and meltwater lednian stonefly—one proposed species[1]—whitebark pine—and one candidate species[2]—monarch butterfly. USFWS_037154.

The Forest is also home to twelve bull trout core areas of the Columbia Headwater Recovery Unit and contains designated bull trout critical habitat in four sub-units of the Clark Fork River Basin Critical Habitat Unit.[3]  USFWS_037180. The Forest is located within the grizzly bear North Continental Divide Ecosystem ("NCDE") and over 2.1 million acres of the Forest are included in the NCDE recovery zone/primary conservation area ("PCA"), which constitutes approximately 37% of the total area of the PCA.[4]  USFWS_037156.

---

[1] A "proposed species" is any species of fish, wildlife, or plant that is proposed to be listed as endangered or threatened under Section 4 of the Endangered Species Act.  50 C.F.R. § 402.02.  Once a species is proposed, a year-long review period commences at the end of which the Service will make a final listing determination.  USFWS_037155.

[2] A "candidate species" is "a species that is undergoing a status review to determine whether it warrants listing as endangered or threatened under the Endangered Species Act."  NOAA, *Glossary: Classification for Protected Species*, https://www.fisheries.noaa.gov/laws-and-policies/glossary-endangered-species-act (last visited June 12, 2024).

[3] A "core area" is "the closest approximation of a biologically functioning unit for bull trout, meaning it has both the habitat that could supply all elements for the long-term security of bull trout and a group of one or more local bull trout populations."  USFWS_037155.

[4] The NCDE recovery zone/primary conservation area "is an area that will be managed as a source of grizzly bears in the NCDE."  The objective within this zone is "continual occupancy by grizzly bears and maintenance of habitat conditions that are compatible with a stable to increasing grizzly bear population." USFWS_037168.

## II.     Historical Management of the Flathead National Forest

Forest Plans are the primary source of direction for National Forests and are intended to provide forest-wide, geographic-area, and management-area desired conditions, objectives, standards, guidelines, and suitability of lands for specific uses.  FS-051881–83.  The 1986 Flathead National Forest Land Resource Management Plan (the "1986 Forest Plan") and its amendments "provided a framework for management of all forest resources" on the Forest for over 30 years.  FS-054719.

Of particular relevance here, Amendment 19, which was adopted in 1995, outlined objectives and standards for motorized use and motorized route density within grizzly bear management units on the Forest.  USFWS_037316.  Amendment 19 required that there be no net increase in total motorized route density ("TMRD") greater than 2 miles per square mile, no net increase in open motorized route density ("OMRD") greater than 1 mile per square mile, and no net decrease in the amount of security core area.[5]  USFWS_037316.  Amendment 19 also provided management direction to reduce impacts of forest management activities on grizzly bears, especially female grizzly bears.  USFWS_037316.  Although the Forest never fully met the objectives set forth in Amendment 19,

---

[5] A "security core area" is "an area more than ½ kilometer from any road receiving motorized use, any motorized trail, or any trail receiving high-intensity non-motorized use."  FS-178201.

from 1995 to 2011 the NCDE grizzly bear population increased and, today, the population is estimated to be over 1,000 individuals distributed throughout, and even beyond, the recovery zone/PCA boundary.  USFWS_037284.

An important aspect of Amendment 19 with respect to the current litigation is its standards for roads and road density calculations.  Under Amendment 19, the Forest Service was required to reclaim a road before excluding it from OMRD, TMRD, and secure core area calculations.  FS-178393.  Under Amendment 19,  a "reclaimed"  road is one that "has been treated in such a manner so as to no longer function as a road or trail and has a legal closure order until reclamation is effective," which could be "accomplished through one or a combination of treatments including: recontouring to original slope, placement of natural debris, or revegetation with shrubs or trees."  FS-178392.  Minimum treatment requirements for reclaimed roads include the following:

(a) The entire road will receive treatment such that maintenance or entries to maintain "road drainage" is not needed. This will require removal of culverts or other water passage structures that are aligned-with stream channels. In most cases this will also require that road related sediment sources be repaired and the road reworked to eliminate ditch water flow without the aid of cross drain culverts.

(b) The first portion of the road (typically 200 to 600 feet) will be treated in such a manner so as to preclude its use as a motorized or non-motorized travel way. This will include: (1) making the road junction area unattractive as a travelway, and (2) treating the remainder of the first portion to make awareness of the road· improbable and preclude motorized or non-motorized use.

(c) Treat the road, other than the first portion, in a way that will discourage its use as a motorized or non-motorized travelway. Treatment should include: sporadic placement of natural debris over most of the road length, and surface treatment to encourage natural, planted or seeded revegetation.

FS-178392.  Reclaimed roads are closed to both public and administrative use.  FS-178392.

## III.   2018 Flathead National Forest Revised Land Management Plan

Pursuant to the National Forest Management Act, forest plans must undergo revision at least every fifteen years.  16 U.S.C. § 1604(f)(5)(a).  In 2018, the United States Forest Service replaced the 1986 Forest Plan with the 2018 Flathead National Forest Land Management Plan (the "Revised Forest Plan").  FS-054711. Prior to final approval and adoption of the Revised Forest Plan, the Forest Service completed NEPA review, which included preparation of a final environmental impact statement.  FS-054711, 17.  FWS completed its biological assessment in 2017 and concluded that the Revised Forest Plan "is likely to adversely affect" bull trout and designated bull trout critical habitat, grizzly bear, Canada lynx, and Canada lynx critical habitat.  USFWS_001341–2.  In November 2017, FWS issued its first Biological Opinion (the "2017 BiOp"), which concluded that the Revised Forest Plan was unlikely to jeopardize the threatened or endangered species found on the Forest, nor was it likely to adversely modify their critical habitat. USFWS_001957–60, 002058–63, 002166–73.

6

Similar to Amendment 19, the Revised Forest Plan requires projects to result in no net increase in TMRD or OMRD and no net decrease in secure core area relative to baseline conditions in each bear management subunit within the NCDE recovery zone/PCA.[6]  USFWS_037366.  Baseline conditions are the on-the-ground conditions in the Forest "as of December 31, 2011, as modified by changes in numbers that were evaluated and found to be acceptable through the Endangered Species Act section 7 consultation with [FWS] while the grizzly bear was listed as threatened."  FS-052052.  FWS determined that "[t]he best available science indicates that the [2011] baseline conditions . . . provide adequate habitat conditions . . . to support a stable to increasing grizzly bear population."  USFWS_037366.

However, a key difference between the Revised Forest Plan and the 1986 Forest Plan is the replacement of Amendment 19's "reclaimed" road standard with the new "decommissioned," "impassable," and "intermittent stored service/intermittent service road, closed to traffic" road standards.  FS-052087.  A "decommissioned" road is defined as "[a]n unneeded road that has been stabilized

---

[6] A "bear management subunit" is "[a]n area of a bear management unit, in the portion of the Northern Continental Divide Ecosystem for grizzly bears mapped as the primary conservation area, representing the approximate size of an average annual female grizzly bear home range (e.g., 3168 square miles)."  FS-052052.  A "bear management unit" is "[a]n area about 400 square miles, in the portion of the Northern Continental Divide Ecosystem for grizzly bears mapped as the primary conservation area, that meets yearlong habitat needs of both male and female grizzly bears."  FS-052052.

and restored to a more natural state." FS-052079. An "impassable" road is

defined as:

> A road that has been treated in such a manner that the road is blocked
> and there is little resource risk if road maintenance is not performed on
> a regular basis (self-maintaining). . . . Roads may become impassable
> due to a variety of causes, including but not limited to one or more of
> the following: natural vegetation growth, road entrance obliteration,
> scarified ground, fallen trees, boulders, or culvert or bridge removal.
> Impassable roads may remain on the inventoried road system if use of
> the road is anticipated at some point in the future.

FS-052079. An "intermittent stored service/intermittent service road, closed to

traffic" is defined as " a road that is in such a condition that "there is little resource

risk if maintenance is not performed." FS-052079. Some, but not all, roads placed

in intermittent stored service may be impassable. FS-052079. Impassable roads

are excluded from TMRD "as long as the road (generally the first 50 to 300 feet)

has been treated to make it inaccessible to wheeled motorized vehicles during the

non-denning season." FS-052079. Decommissioned roads are excluded from

TMRD only if they also meet the definition of impassable. FS-052079.

## IV.    Prior Litigation

In April 2019, several environmental plaintiffs—including Plaintiffs Swan

View Coalition and Friends of the Swan—filed a lawsuit challenging the Revised

Forest Plan under the National Environmental Policy Act, the Endangered Species

Act ("ESA"), and the Travel Management Rule. *WildEarth Guardians v. Steele*,

545 F. Supp. 3d 855, 862–63 (D. Mont. 2021), *aff'd in part, vacated in part,*

8

*remanded sub nom. Swan View Coal. v. Steele*, No. 22-35137, 2023 WL 3918686
(9th Cir. June 9, 2023) (hereinafter *Flathead I*).  The Court addressed these
challenges and held that the 2017 BiOp violated the ESA because: (1) it failed to
"consider the impact of ineffective road closures on the 2011 baseline population
for grizzly bears or the effects of the Revised [Forest] Plan on the grizzly species
as a whole"; (2) included a deficient road density and secure core surrogate; and
(3) failed to "consider the effect on bull trout of withdrawing the mandatory culvert
removal requirement."  *Id.* at 880–81.  Because the Forest Service relied on the
flawed 2017 BiOp, the Forest Service's decision to adopt the Revised Forest Plan
also violated the ESA.  *Id.* at 881.  The Court remanded to the agencies, without
vacatur, for further consideration of these issues.  *Id.* at 886.

Swan View Coalition and Friends of the Swan appealed *Flathead I* to the
Ninth Circuit Court of Appeals.  *See Swan View Coal. v. Steele*, No. 22-35137,
2023 WL 3918686 (9th Cir. June 9, 2023).  The Ninth Circuit ultimately dismissed
plaintiff-appellants' ESA claims as moot because FWS had issued the superseding
Revised BiOp.  *Id.* at *1.  Accordingly, the Ninth Circuit vacated the portion of this
Court's summary judgment rulings addressing plaintiff-appellants' ESA claims
and remanded with instructions for this Court to dismiss the ESA claims as moot.
*Id.*

## V.   2022 Revised Biological Opinion and Current Litigation

In June 2022, Defendants notified the Court that they had satisfied their remand obligations pursuant to *Flathead I* via the Revised BiOp.  The Revised BiOp again concluded that the Revised Forest Plan is not likely to jeopardize the continued existence of grizzly bears, USFWS_037364, or bull trout, USFWS_037250, or adversely modify designated bull trout critical habitat, USFWS_037252.

Plaintiffs filed the instant action on May 31, 2022, (Doc. 1), and the First Amended Complaint on September 23, 2022, (Doc. 16).  In the First Amended Complaint, Plaintiffs allege that FWS and the Forest Service violated the ESA by failing to rationally consider threats to grizzly bears (Claim I) and bull trout (Claim II).  The parties filed cross-motions for summary judgment (Docs. 26, 29) and Judge DeSoto issued her Findings and Recommendations on March 11, 2024. (Doc. 58.)

**LEGAL STANDARDS**

## I.   APA

The APA requires a reviewing court to set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed

to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible

that it could not be ascribed to a difference in view or the product of agency

expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. 29, 43 (1983).  An agency action likewise is arbitrary and capricious

if the agency fails to articulate a satisfactory explanation for its action, including a

rational connection between the facts found and the choice made.  *Id.*  A court may

not accept an agency's post hoc rationalizations for its action.  *Id.* at 50.  "It is

well-established that an agency's action must be upheld, if at all, on the basis

articulated by the agency itself."  *Id.*

## II.   ESA

ESA claims are reviewed under the APA standard, "[i]rrespective of whether

an ESA claim is brought under the APA or the citizen-suit provision."  *All. for the*

*Wild Rockies v. Krueger*, 664 F. App'x 674, 675 (9th Cir. 2016) (quoting *W.*

*Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011)).

Section 7(a)(2) of the ESA provides:

Each Federal agency shall, in consultation with and with the assistance
of the Secretary[ of Interior], insure that any action authorized, funded,
or carried out by such agency (hereinafter in this section referred to as
an "agency action") is not likely to jeopardize the continued existence
of any endangered species or threatened species or result in the
destruction or adverse modification of habitat of such species which is
determined by the Secretary, after consultation as appropriate with
affected States, to be critical, unless such agency has been granted an

> exemption for such action by the Committee pursuant to subsection (h) of this section.  In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2).  In relevant part, Section 7(b)(3)(A) of the ESA provides:

> Promptly after conclusion of consultation . . . , the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat.

*Id.* § 1536(b)(3)(A).

The ESA's implementing regulations expand upon these requirements.  If the action agency—here, the Forest Service—determines that its action may affect a listed species or critical habitat, formal consultation is required, subject to exceptions not applicable here.  50 C.F.R. § 402.14(a)–(b).  An agency requesting formal consultation "shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat."  *Id.* § 402.14(d).

FWS, in turn, has numerous responsibilities during formal consultation, including:

> (1)    Review all relevant information provided by the Federal agency or otherwise available.  Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

12

(2)    Evaluate the current status and environmental baseline of the listed species or critical habitat.

(3)    Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4)    Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.
. . . .
(7)    Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

(8)    In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation. Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans.

*Id.* § 402.14(g).  FWS's biological opinion must include "[a] summary of the information on which the opinion is based," a "detailed discussion of the environmental baseline of the listed species and critical habitat," a "detailed discussion of the effects of the action on listed species or critical habitat," and the Service's jeopardy or no jeopardy opinion.  *Id.* § 402.14(h).  The formal consultation process ends with FWS's issuance of the biological opinion.  *Id.* § 402.14(m)(1).

13

## III.   SUMMARY JUDGMENT

The Court can resolve an issue summarily if "there is no genuine dispute as to any material fact" and the prevailing party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is genuine when there is sufficient evidence for a reasonable factfinder to return a verdict for the other party.  *Id.*  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## DISCUSSION

### I.   Motion to Strike and Motion for Leave to File

Judge DeSoto recommends denying Defendants' Motion to Strike and granting Plaintiffs' Motion for Leave to File Third Hammer Declaration.  (Doc. 58 at 46.)  Neither party filed objections to Judge DeSoto's findings and recommendations on these motions.  Reviewing for clear error, the Court finds none.

### II.   Grizzly Bear ESA Claims

In their Motion for Summary Judgment, Plaintiffs raised three claims regarding grizzly bears: (1) FWS failed to adequately consider impacts from

unauthorized motorized use; (2) FWS failed to consider adverse impacts from

unused roads; and (3) FWS failed to consider impacts from increased roadbuilding.

(Doc. 27 at 27–32.)  The Court will address each claim in turn.

### A.    Unauthorized Motorized Use

Judge DeSoto recommends granting summary judgment in favor of

Plaintiffs "insofar as FWS failed to consider the impact of ineffective road

closures."  (Doc. 58 at 45–46.)  Judge DeSoto found that FWS appropriately

evaluated unauthorized motorized use as part of the "environmental baseline"

rather than as part of the "effects of the action," (*id.* at 19), but, pursuant to this

Court's holding in *Center for Biological Diversity v. United States Forest Service*,

670 F. Supp. 3d 1121 (D. Mont. 2023) (hereinafter "*Knotty Pine*"), FWS failed to

adequately consider unauthorized motorized use in road density calculations, (*id.* at

20–25).

Defendants object to these findings and recommendation and argue that this

case is distinguishable from *Knotty Pine*, (Doc. 61 at 6), and "the record evidence

in this case shows that the agencies reached a reasonable conclusion on the issue in

these circumstances," (*id.* at 9).  Reviewing de novo, the Court finds that FWS's

decision was arbitrary and capricious because the agency failed to address the

exclusion of unauthorized motorized use from road density calculations and, to the

extent the agency did address this issue, failed to articulate a satisfactory explanation regarding its decision.

In response to the Court's remand order in *Flathead I*, FWS added a section to the Revised BiOp regarding "Illegal Road Use" in its discussion of the "Environmental Baseline"  USFWS_037323–25.  At the outset of this section, FWS stated that "motorized access in areas unauthorized for such use . . . and any other illegal activities are not the result of a federal action and therefore not analyzed under effects of the action, *but their influence is considered for describing the environmental baseline*."  USFWS_037323 (emphasis added).  The "environmental baseline" is "the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action."[7]  50 C.F.R. § 402.02. The environmental baseline "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.*

---

[7] The "environmental baseline" discussed here is distinct from the 2011 baseline described above.  The former describes actual on-the-ground conditions at the time of the decision, whereas the latter describes the "baseline" on-the-ground habitat conditions necessary to support grizzly bear populations on the Forest as determined by FWS  USFWS_037283.

The BiOp then acknowledged that "[i]llegal motorized access could occur anywhere on the [Forest]" and explain that "[Forest Service] staff and law enforcement have monitored and enforced road closures since 2011." USFWS_037323.  The BiOp discussed the Forest Service's efforts to monitor the effectiveness of road closures beginning in 2020, which involved "inspect[ing] nearly 1,200 road closure devices on the [Forest]" including "gates and berms on the [Forest] that are accessed by existing, system roads that are open to public motorized use at any time during the non-denning season."  USFWS_037324. FWS reported that "[o]verall, 92% of road closure devices forest-wide were found to be effective at restricting unauthorized, public use," with rates varying between 90% and 97% among districts.  USFWS_037324.  The BiOp then explained that "the [Forest Service] remedies the situation through repair, replacement, or enforcement as soon as possible or practicable after being made aware of the violation."  USFWS_037323.  The BiOp concluded:

> While illegal motorized access *has the potential to affect individual grizzly bears, the amount, location, duration, and timing of effects resulting from such illegal use is typically not known*. The probability of long-term illegal motorized access and probability of illegal access coinciding with the presence of grizzly bears is anticipated to be low but is unknown. As such, the potential consequences to grizzly bears are uncertain. Nonetheless, illegal motorized access is expected to be spatially disparate and temporary and is *not likely to collectively cause an adverse effect* because most [Forest] users follow travel regulations and when illegal use is observed or when user-created roads become apparent the [Forest Service] corrects the situation as soon as they are able.

17

. . . .

Although the effects of illegal motorized access are considered in the baseline for the proposed action, *a change to the metrics used by the [Forest] to assess baseline access conditions would not occur as such use was not authorized, carried out, or funded by the Forest*. Also, illegal motorized access would most likely result in *short-term, temporary effects to grizzly bears as opposed to a permanent change* in motorized access conditions because the [Forest Service] corrects the situation as soon as they are able.

. . . .

While effects to grizzly bears may occur as a result of illegal motorized access, it is the Service's opinion that such *effects are reasonably uncertain*. Information as to the length, duration, amount of illegal use, type of use, and location, among other conditions, is and likely will continue to be unknown. As such, [FWS] and the [Forest Service] are not able to calculate *the extent of effects to individual grizzly bears*. However, *it is our opinion that the effects of any illegal motorized access on the grizzly population is likely low as evidenced by the* NCDE grizzly bear population status, including an increasing number of grizzly bears, an expansion of the distribution of grizzly bears, and an estimated positive population trend. Because illegal motorized use is not a federal action, any effects associated with illegal motorized access are not exempted under this biological opinion.

USFWS_037324–25 (emphasis added).  FWS reiterated this conclusion in the

"Cumulative Effects" section of the BiOp:

The probability of long-term illegal motorized access and probability of illegal access coinciding with the presence of grizzly bears is anticipated to be low but is unknown. As such, the potential consequences to grizzly bears are uncertain. Illegal motorized access is expected to be spatially disparate and temporary and is not likely to collectively cause an adverse effect because most users follow travel regulations and when illegal use is observed or when user-created roads become apparent the Forest corrects the situation as soon as they are able.

USFWS_037363.

In other words, FWS acknowledged that unauthorized motorized use occurs to some degree on the Forest; determined, based on recent monitoring efforts, that road closure devices on the Forest have a 92% effectiveness rate overall; and ultimately concluded that unauthorized motorized use would not alter the analysis used to calculate baseline OMRD, TMRD, or secure core area because the effects of unauthorized motorized use on grizzly bears is "uncertain" but "likely low" in light of the current on-the-ground conditions, the Forest Service's efforts to curtail unauthorized motorized use, and the spatially and temporally disparate nature of the unlawful activity.

First, Defendants argue that this case is distinguishable from *Knotty Pine* because, in this case, unlike in *Knotty Pine*, the Revised BiOp "addressed the issue of whether unauthorized motorized use should be used in calculating route densities," (Doc. 61 at 6), and "concluded that illegal access does not warrant changes to the road density metrics because those breaches are remedied by the Forest Service," (*id.* at 7). Furthermore, Defendants note that *Knotty Pine* was decided on a motion for preliminary injunction, rather than summary judgment, and involved an individual project, rather than a forest plan. (*Id.* at 8.) The Court disagrees and finds that the holding and principles of *Knotty Pine* are on point in this case.

19

In *Knotty Pine*, plaintiff environmental groups challenged federal defendants' approval of the Knotty Pine timber sale project within the Kootenai National Forest and sought to preliminarily enjoin the project from moving forward. 670 F. Supp. 3d at 1125. The *Knotty Pine* plaintiffs challenged the project BiOp under the ESA for failure to adequately analyze the effects that illegal roads have on grizzly bears in the project area, arguing that FWS's "refusal to consider the presence of illegal roads in the context of OMRD, TMRD, and Core calculations violates their legal obligation to provide a detailed discussion of the effects of the action because they are ignoring an important aspect of the problem, failing to consider the relevant factors, and failing to consider the best available information." *Id.* at 1133.

As in the present case, the *Knotty Pine* BiOp included discussion of illegal road use in its environmental baseline and cumulative effects sections. *Id.* at 1132–33. The *Knotty Pine* BiOp discussed the Kootenai National Forest's monitoring of illegal motorized use across multiple years and third-party surveys of road closure device effectiveness and determined that, while unauthorized motorized use does occur, issues are addressed "in a reasonable and timely manner" and "illegal use will be spatially disparate and temporary." *Id.* at 1132. The *Knotty Pine* BiOp ultimately concluded that, "[w]hile effects to grizzly bears may occur as a result of illegal motorized access . . . , the location and extent of

20

such effects are not reasonably certain." *Id.* at 1333.  Furthermore, "[t]he probability of long-term illegal motorized access and probability of illegal access coinciding with the presence of grizzly bears is anticipated to be low but unknown," and, as such, "the potential consequences to grizzly bears are uncertain from these activities." *Id.*

The Court identified two main issues with FWS's treatment of illegal motorized use in the *Knotty Pine* BiOp.  First, the biological opinion "d[id] not provide any indication that FWS considered including unauthorized motorized access routes in OMRD, TMRD, or Core calculations, let alone provide a rationale for excluding those routes from the calculations." *Id.* at 1135.  Second, FWS's position was contradicted by its own "stated rationales and the evidence before the agency." *Id.*  In particular, the Court criticized the agency's reliance on the "boilerplate assertion" that "because unauthorized motorized access is unpredictable, its effects on grizzly bears are unknowable," and the agency's flawed "permanent vs. temporary" roads distinction. *Id.* at 1135–36.  The Court agreed that, in light of the demonstrated efforts of the Forest Service to "monitor closures and fix known problems promptly . . . , the use of any particular illegal road is, indeed, temporary." *Id.*  Nonetheless, the Court found that "the ongoing chronic problem of ineffective road closures and unauthorized motorized access is permanent" and, according to the record evidence, even occasional roads use can

21

negatively impact grizzly bears. *Id.* The Court also noted the inconsistency between FWS's approach to illegal roads and the approach taken by the Forest Service—"erring on the side of the bear and analyzing routes with evidence of motorized use as open for an entire bear year even if the route may only receive little or short term use." *Id.* at 1137 (internal quotation marks omitted).

Based on these shortcomings, the Court held that the *Knotty Pine* plaintiffs were likely to prevail on the merits of their claim regarding illegal roads. *Id.* at 1138. The Court explained that, while it would defer to the agencies' expertise on how to account for unauthorized motorized access going forward, "the agencies must actually *exercise* that expertise for their decision to stand." *Id.* at 1138. In summary, "[c]laiming a total inability to ascertain, or even estimate, effects of unauthorized motorized use on OMRD, TMRD, and Core—and, by extension, the effects on grizzly bears—despite the evidence in the record . . . does not suffice." *Id.*

To begin, the Court is not persuaded by FWS's argument that the agency "actually considered" the issue and, therefore, this case is distinguishable from *Knotty Pine*. In support of their argument, Defendants cite to the following paragraph found in the environmental baseline section of the Revised BiOp:

> Although the effects of illegal motorized access are considered in the baseline for the proposed action, a change to the metrics used by the [Forest Service] to assess baseline access conditions would not occur as such use was not authorized, carried out, or funded by the Forest.

22

> Also, illegal motorized access would most likely result in short-term, temporary effects to grizzly bears as opposed to a permanent change in motorized access conditions because the [Forest Service] corrects the situation as soon as they are able.

USFWS_037325.  First, this paragraph appears to only address the inclusion of unauthorized motorized use in the *baseline* road density calculations rather than future road density calculations.  Even if this paragraph can be read more broadly to reflect the agency's decision not to incorporate unauthorized motorized use into road density calculations whatsoever, it is clear that the Court's holding in *Knotty Pine* contemplates much more than a single, conclusory paragraph when requiring the agency to "actually exercise" its expertise.  Moreover, the Court's holding in *Knotty Pine* stands for the proposition that FWS must both consider whether unauthorized motorized use should be incorporated into calculations of TMRD and OMRD *and* explain its decision in light of the evidence before it.  As addressed in more detail below, FWS has failed to support its position.

The Court is also unpersuaded by Defendants' argument that *Knotty Pine* is inapplicable here because *Knotty Pine* involved a preliminary injunction motion and a single proposed project.  In *Alliance for the Wild Rockies v. Marten*, 685 F. Supp. 3d 971 (D. Mont. 2023), the Court applied its holding in *Knotty Pine* in the context of ESA challenges to the Helena-Lewis and Clark National Forest Plan's Biological Opinion.  In that case, the plaintiffs moved for summary judgment on the grounds that "FWS violated its obligations under the ESA because it did not

seek out, disclose, and meaningfully analyze the effects and/or cumulative effects of pervasive illegal motorized use on grizzly bears across the Forest." *Id.* at 984 (internal quotation marks omitted).  As in this case, the *Marten* BiOp discussed illegal motorized use in the environmental baseline and cumulative effects sections.  *Id.* at 982–84.  The environmental baseline section concluded that the effects of illegal motorized use on grizzly bears are "reasonably uncertain," but "likely low as evidenced by the NCDE grizzly bear population status, including an increasing number of grizzly bears, an expansion of the distribution of grizzly bears, and an estimated positive population trend." *Id.* at 982–83.  Relying on its earlier holding in *Knotty Pines*, the Court in *Marten* concluded that the Biological Opinion did not "adequately assess[] the environmental baseline and cumulative effects to reach its no jeopardy conclusion." *Id.* at 985.  The Court reiterated its rejection of the "boilerplate" assertion that the effects on grizzly bears from unauthorized motorized use are "unknowable" and faulted FWS for its "reliance on the temporally and spatially disparate (and thus purportedly unpredictable) effects of motorized use." *Id.*

As illustrated by *Marten*, the Court's holding in *Knotty Pine* applies equally in the context of a motion for summary judgment regarding ESA challenges to a forest plan biological opinion.  If anything, the fact that the Court granted the preliminary injunction in *Knotty Pine* based in part on the issue of unauthorized

24

motorized use demonstrates that this is an error that should not survive summary judgment.  Likewise, the scale—both temporally and physically—of a forest plan is much larger than that of an individual project, and therefore, the importance of the agency's failure to adequately consider or support its decision are only that much stronger.

Defendants also attempt to distinguish the present case from *Marten* by pointing out that, in *Marten*, the Court also addressed the issue of "law enforcement records related to unauthorized motorized use and 'closed on paper roads'" and the record evidence in *Marten* demonstrated a closure device failure rate of 57% as opposed to the 8% found in this case.  (Doc. 61 at 8.)  Neither of these distinctions make the principles discussed in *Knotty Pine* and applied in *Marten* any less applicable to the present case.  Moreover, in this case, Plaintiffs have offered evidence of closure device failure rates higher than the 8% cited by Defendants, including a 2004 survey finding a 62.5% ineffective closure rate. FS_065788.

This brings the Court to Defendants' second objection: that the record evidence supports FWS's analysis and conclusion.  The Court agrees that, ultimately, the Court must look to the agency's analysis in light of the evidence in the record to determine whether the agency acted reasonably.  But, as in *Knotty Pine* and *Marten*, FWS has failed to support its decision with sufficient evidence.

25

Defendants point to "two key factors" that they argue support FWS's decision to exclude unauthorized motorized use from road density calculations: (1) "the NCDE grizzly bear population is robust," (Doc. 61 at 9); and (2) the illegal use "is spatially disparate and temporary," (*id.* at 10).  Neither of these "factors" provide adequate support for the agency's determination.

This Court has squarely rejected the "boilerplate" assertion that unauthorized motorized access is unpredictable and, therefore, its effects on grizzly bears are unknowable.  Yet, FWS relies on this same flawed premise in reaching its conclusion in the Revised BiOp.  The Court has also squarely rejected the argument that unauthorized motorized use is "spatially disparate and temporary," concluding that such use, and its effects, are actually permanent.  Again, FWS repeats this error in the Revised BiOp.  Finally, an increase in the NCDE bear population prior to implementation of the Revised Forest Plan does not provide sufficient support for the agency's position because the new "impassable" road standard could result in increased unauthorized motorized use due to an increased reliance on road closure methods that are not entirely effective.

In conclusion, the Defendants' objections to Judge DeSoto's findings and recommendation concerning unauthorized motorized use are overruled.  However, the Court must make one modification to Judge DeSoto's findings.  Judge DeSoto found that the caselaw established a "general rule that road density calculations

26

*must include* a material quantification of unauthorized motorized use." (Doc. 58 at 25.) The Court does not hold that FWS *must* incorporate unauthorized motorized use into road density calculations; rather, it must decide *whether* to incorporate unauthorized motorized use into road density calculations and *support* its decision with the best available science. Accordingly, FWS violated the ESA because its decision with respect to this issue was arbitrary and capricious.

## B.   Unused Roads

Judge DeSoto recommends granting summary judgment in favor of Defendants "insofar as FWS properly addressed the impacts of unused roads . . . on grizzly bears."[8] (Doc. 58 at 46.) First, Judge DeSoto found that this issue had already been resolved by the Court in *Flathead I.* (Doc. 58 at 27.) Nonetheless, Judge DeSoto went on to find that FWS sufficiently considered the Revised Forest Plan's new direction in light of the best available scientific information, including the "positive trends" in the NCDE grizzly bear population and the scientific studies cited in the Revised BiOp. (*Id.* at 27–29.)

Plaintiffs object and argue that Judge DeSoto erred in three respects: "(1) incorrectly stating that the issue need not be decided; (2) improperly invoking

---

[8] Plaintiffs use the term "unused" or "unused, barriered" roads in their arguments. (Docs. 27 at 30; 60 at 18.) This category of road could include roads that are temporarily closed or used for limited purposes; however, these categories of roads are counted toward TMRD. Thus, it would appear that Plaintiffs' argument actually centers around "impassable" roads, which do not count toward TMRD under the Revised Forest Plan.

'positive population trends' in the NCDE grizzly population to nevertheless dismiss these unexamined impacts; and (3) stating that FWS need not consider such impacts despite acknowledging that unused roads <u>do</u> displace some grizzly bears, particularly females." (Doc. 60 at 18 (internal citations omitted).) Reviewing de novo, the Court agrees with Plaintiffs and finds that FWS acted in an arbitrary and capricious manner by offering an explanation for its decision that runs counter to the evidence in the record.

Regarding Plaintiffs' first objection, the Court agrees that *Flathead I* did not fully resolve this this issue in Defendants' favor. In that case, the plaintiffs also raised several challenges to the Revised Forest Plan's treatment of impassable roads. *Flathead I*, 545 F. Supp. 3d at 867–68. The Court acknowledged that because "roads are 'an important aspect of the problem' of maintaining grizzly bear populations, the Fish and Wildlife Service was obligated to consider the road reclamation and density standards of the Revised [Forest] Plan." *Id.* at 867. However, the Court did not explicitly address the exclusion of impassable roads from TMRD. Instead, the Court focused its attention on the plaintiffs' arguments regarding the effectiveness of road closure devices. *Id.* at 868. It appears that the Court treated these challenges—which significantly overlap in the plaintiffs' briefing—as one-in-the-same and ruled in the plaintiffs' favor regarding

28

ineffective road closures without reaching plaintiffs' other argument regarding TMRD.

At the same time, Defendants are correct that the Court did not explicitly remand to the agency to reconsider the exclusion of impassable roads in TMRD calculations.  Defendants are also correct that the Court granted the plaintiffs' motion for summary judgment only "to the limited extent explained in [the] Order," and granted summary judgment in favor of the defendants "in all other respects."  *Id.* at 88–86.  Regardless, the Court's ruling in *Flathead I* on the ESA claims was vacated by the Ninth Circuit and Judge DeSoto went on to address the merits of Plaintiffs' argument.  Accordingly, the Court is not bound by its decision in *Flathead I* and will address Plaintiffs' remaining objections to Judge DeSoto's findings on the merits.

Turning to Plaintiffs' second objection, the Court agrees that the "positive population trend" of the NCDE grizzly bear population does not provide adequate support for Defendants' position.  As this Court explained in *Flathead I* "[t]he mere fact that the population was increasing from 2004-2011 does not justify moving away from the existing management requirements of Amendment 19."  *Id.* at 873.  Essentially, "by recognizing that Amendment 19 laid the foundation for recovery of the NCDE population and then using that recovery as justification for getting rid of [Amendment 19's requirements], [FWS] eschews Amendment 19

precisely because it was working." *Id.*  The Court likened such behavior to

"throwing away your umbrella in a rainstorm because you are not getting wet." *Id.*

This same logic applies equally here.

Defendants contend that the Revised Forest Plan will ultimately "maintain

baseline levels of [OMRD], TMRD, and secure core . . . that would support

continued recovery of the NCDE grizzly bear population.  (Doc. 63 12–13 (citing

USFWS_037349).)   But Defendants' argument misses the point.  The issue is not

a change in TMRD levels, but a change in how TMRD is calculated.  Under the

Revised Forest Plan, a road will be excluded from TMRD if it meets the definition

of impassable.  However, under Amendment 19, a road had to meet the more

demanding reclaimed road standard before it would be excluded from TMRD

calculations.  Contrary to Defendants' arguments, the impassable standard is

plainly less demanding than the reclaimed standard—reclaimed roads have

specific, mandatory minimum treatment standards, such as removal of all stream

aligned culverts, that are not required for impassable roads.  As such, relying on

2011 baseline TMRD levels does not address the concern raised by Plaintiffs.

Turning to Plaintiffs' final objection, the Court agrees that the scientific

evidence cited by FWS does not support the agency's decision to exclude

impassable roads from TMRD calculations.  Plaintiffs specifically cite to Mace and

Waller (1997), which FWS relied upon in the Revised BiOp and which Judge

DeSoto found supported FWS's position.  (Doc. 60 at 21.)  Plaintiffs argue that

Mace and Waller (1997) undermines, rather than supports, Defendants' position

and that, therefore, Judge DeSoto erred in concluding that "FWS considered the

Revised [Forest] Plan's new direction in light of the best available scientific

information."  (*Id.* at 22.)  Defendants contend that Plaintiffs are "cherry-picking"

evidence that supports their position and that Mace and Waller (1997) actually

supports the agency's position.  (Doc. 63 at 13–14.)

Mace and Waller (1997) found that "grizzly bear seasonal ranges were

comprised mostly of Class 1 [<1 vehicle/day] and Class 2 [1–10 vehicles/day]

roads," FS-182182, and that "avoidance of high total road densities areas [sic] was

evident for some bears, even though roads were closed to public travel," FS-

182182–83.  For female grizzly bears, home range "[s]election was greatest for

unroaded cover types and declined as road densities increased."  FS-182182.  The

study noted some positive preference toward closed roads or roads used by fewer

than ten vehicles per day, but concluded that "neutral use of, or positive selection

towards[,] habitats near roads implies that important habitats occur near roads,"

rather than a preference toward the roads themselves.  FS-182183.  The researchers

ultimately concluded that "grizzly bears can persist in areas with roads, but spatial

avoidance will increase and survival will decrease as traffic levels, road densities,

and human settlement increases."  FS-182183.

31

These findings undermine FWS's position that exclusion of "impassable" roads from TMRD calculations will not negatively affect grizzly bears. Mace and Waller (1997) demonstrated an inverse relationship between road density and habitat selection, especially for female grizzly bears, even if the roads are closed. FWS acknowledges that road avoidance behavior has negative consequences for grizzly bear populations because "displacement from important habitats result[s] in lowered survival rates during the non-denning season." USFWS_037306. Yet, FWS fails to explain how the exclusion of "impassable" roads from TMRD calculations—which could result in a net increase in total road density without any corresponding change in TMRD—does not negatively impact bears. The fact that Mace and Waller (1997) showed a "spectrum" of avoidance behavior does not sufficiently support the agency's position. Moreover, the "spectrum" argument is undermined by various other scientific studies referenced by FWS that conclude "grizzly bears *consistently* were displaced from roads and habitat surrounding roads, *often despite relatively low levels of human use*. USFWS_037333 (emphasis added).

Furthermore, the other scientific studies cited in the Revised BiOp similarly do not support the agency's position. For example, Mace and Manley (1993) found "grizzly bears adjusted their habitat use patterns in response to both total and open road densities, as well as the traffic levels on roads." USFWS_037306. The

study also found that habitat use by all sex and age classes of grizzly bears was less than expected when total road densities—which would include closed roads—exceeded two miles per square mile, with more prominent effects on female grizzly bears. FS-067222. Importantly, the researchers also noted that "[u]nless a road has *completely* revegetated, managers should assume that some level of human use is occurring along closed roads, and grizzly bears will respond to that use." FS-067222 (emphasis added). This finding again undermines FWS's decision to exclude impassable roads from TMRD.

Finally, FWS acknowledges that road avoidance behavior is not exclusively tied to motorized use of roads, stating "[n]egative association with roads arises from fear of vehicles, vehicles noise, *and other human-related activities around roads*" such as "hunting and shooting along or from roads." USFWS_037332 (emphasis added). FWS also acknowledges that "[g]rizzly bears that experience these negative consequences learn to avoid the disturbance generated by roads and *may not choose to use these habitats even long after road closures*." USFWS_037332 (emphasis added). Yet, under the Revised Forest Plan, once a road is deemed impassable it is excluded from TMRD even though human-related activities and avoidance behavior may continue.

Accordingly, the Court grants Plaintiffs' objections and concludes that FWS offered an explanation for its decision to exclude impassable roads from TMRD

calculations that runs counter to the evidence before the agency.  Therefore, FWS acted in an arbitrary and capricious manner in violation of the ESA.

### C.   Increased Road Building

Finally, Judge DeSoto recommends granting summary judgment in favor of Defendants "insofar as FWS properly addressed the impacts of . . . increased road building on grizzly bears." (Doc. 58 at 46.)  Judge DeSoto found that Plaintiffs' arguments "find no support in the record" and therefore "declined to engage in unsupported speculation." (*Id.*)  Neither party objected to these findings and recommendation.  Reviewing Judge DeSoto's findings and recommendation for clear error, the Court finds none.

## III.   Bull Trout ESA Claims

Plaintiffs also argue that FWS violated the ESA by failing to rationally consider the impacts on bull trout from: (1) allowing culverts to remain on impassable roads; and (2) increased sedimentation to bull trout streams from unauthorized motorized use, allowing impassable roads to remain intact on the landscape but omitting them from road density calculations, and facilitating increased roadbuilding. (Doc. 27 at 33, 35.)  The Court will address each argument in turn.

### A.    Culvert Removal

Judge DeSoto recommends granting summary judgment in favor of
Plaintiffs "insofar as FWS failed to consider the effects of allowing culverts to
remain on impassable roads."  (Doc. 58 at 46.)  Judge DeSoto found that FWS
failed to satisfy *Flathead I*'s remand order by limiting its analysis of culvert
removal to decommissioned roads and excluding impassable roads, (*id.* at 34);
however, FWS did not violate the ESA by limiting the incidental take statement to
the Conservation Watershed Network, (*id.* at 36).  Defendants object and argue that
Judge DeSoto erred by "ignor[ing] the plain language of *Flathead I*,"
"underestimate[ing] the Culvert Monitoring Plan," and "overlook[ing] other
measures aimed at reducing sedimentation that affects bull trout."  (Doc. 61 at 14.)
Reviewing de novo, the Court finds that FWS was arbitrary and capricious for
failing to address its decision to abandon the culvert removal requirement with
respect to "impassable" roads.

Regarding Defendants' first objection, the Court disagrees that Judge
DeSoto erred in finding that FWS failed to remedy the error identified in *Flathead
I*.  In *Flathead I*, the Court addressed the 2017 BiOp's analysis of culvert removal.
The Court noted that FWS had "identified sedimentation as a threat to bull trout
and suggested that 'sediment impacts from roads could be addressed by,' among
other things, 'maintaining bridges, culverts and crossings; or decommissioning

surplus roads and removing culverts and bridges on closed roads"; however, "road decommissioning under the Revised [Forest] Plan does not include mandatory culvert removal." 545 F. Supp. 3d at 870. The Court continued, "[w]ith its emphasis on the relationship between bull trout population and habitat conservation and culvert management and removal, it is inexplicable why . . . the [FWS] determined that culvert removal is no longer required." *Id.* The Court rejected the agency's explanation that the Revised Forest Plan's guidelines would "function in the aggregate to remove problem culverts," *id.*, and that "non-motorized roads posed less of a threat for culvert failure and, consequently, sedimentation," i*d.* at 871. The Court ultimately held that "the scientific evidence does not support the Revised [Forest] Plan's shift away from mandatory culvert removal, particularly since the [FWS] endorsed culvert removal as one of the most effective bull trout protection tools," *id.* at 869; thus, the agency's "abandonment of the culvert removal requirement was arbitrary and capricious," *id.* at 871.

In the Revised BiOp, FWS concluded that "[t]he Forest Service's removal of the requirement to remove culverts when decommissioning roads could result in effects to bull trout and bull trout critical habitat." USFWS_037231. FWS concluded that an incidental take statement ("ITS") was warranted for the incidental take of bull trout resulting from the "potential degradation of aquatic habitat parameters as a result of the [Revised Forest Plan] no longer containing a

requirement to remove culverts when decommissioning roads."  USFWS_037254.

Because FWS determined that "the actual amount or extent of incidental take

cannot be determined with reasonable accuracy," a surrogate must be used to

"calculate the amount or extent of incidental take and determine when the

anticipated amount of take has been exceeded."  USFWS_037255.  FWS chose the

following surrogate: "any road decommissioning in bull trout watersheds on the

[Forest] that does not remove culverts."  USFWS_037255.  Accordingly, "if roads

within bull trout watershed are decommissioned without removing culverts, the

level of incidental take exempted under this biological opinion would be exceeded,

and reinitiation of consultation would be required."  USFWS_037255.

Plaintiffs criticize the ITS as "illusory" because it does not apply to

impassable roads, only decommissioned roads.  (Doc. 27 at 34.)  Defendants

respond that these revisions satisfy the Court's remand order.  Defendants read the

holding of *Flathead I* too narrowly by limiting its discussion to culvert removal on

decommissioned roads and ignoring impassable roads.

First, it is important to understand the distinction between decommissioned

roads and impassable roads.  A decommissioned road is an "unneeded road that

has been *stabilized* and *restored to a more natural state*."  FS-052079 (emphasis

added).  An impassable road is a "road that has been treated in such a manner that

the road is *blocked* and there is *little resource risk if road maintenance is not*

*performed on a regular basis* (self-maintaining)." FS-052079 (emphasis added). "Decommissioned roads do not count towards total motorized route density as long as they meet the definition of impassable." FS-052079. Accordingly, decommissioned roads and impassable roads are separate, but overlapping concepts: some, but not all, decommissioned roads are also impassable. Therefore, the ITS would only apply to impassable roads that also meet the definition of decommissioned.

It's true that the Court in *Flathead I* focused much of its discussion on decommissioned roads; however, it appears that the Court was using the term "decommissioned" more broadly, so as to include impassable roads. *Flathead I*, 545 F. Supp. 3d at 870 (stating that "road decommissioning under the Revised [Forest] Plan does not include mandatory culvert removal" then citing the definition for "impassable" roads). Furthermore, the Court's discussion clearly indicates a broader concern over the agency's decision to abandon Amendment 19's culvert removal requirement under the reclaimed road standard—a decision that implicates both decommissioned and impassable roads under the Revised Forest Plan. Thus, the error identified in *Flathead I* persists in the Revised BiOp because FWS has again failed to address the effects of abandoning the culvert removal requirement on impassable roads.

This reading of *Flathead I* is consistent with FWS's own opinion that "[c]ulvert removal is an effective method in making a *barriered* [or] decommissioned road hydrologically stable or disconnected from adjacent water ways" and "[i]n general, culverts that remain in the road *behind gates or berms* could be at an increased risk for failure by reducing awareness of potential maintenance needs." USFWS_037231 (emphasis added). The Forest Service's 2015 Recovery Plan for the Coterminous United States Population of Bull Trout similarly states that "sediment impacts from roads can be addressed by identifying sediment-producing areas; . . . maintaining bridges, culverts, and crossings; or decommissioning surplus roads *and removing culverts and bridges on closed roads*." FS-017013 (emphasis added). Thus, it would appear that both agencies agree that culvert removal is an important component of managing sediment impacts on both decommissioned and closed/barriered roads, which includes impassable roads.

This reading of *Flathead I* is also consistent with the opinion of the Forest Service's own biologist who noted in an email that the agency is not "decommissioning many roads anymore and instead [is] making new roads meet the new impassable definition" and, therefore, would "not necessarily remove culverts." FS-FNF2-191073. The biologist further noted that, in his opinion,

neither the plaintiffs nor the Court in *Flathead I* intended to limit the agency's analysis of culvert removal to decommissioned roads.  FS-FNF2-191073.

Turning to Defendants' remaining objections, the Court is also unpersuaded that the Culvert Monitoring Plan, ITS, and other components of the Revised Forest Plan act as sufficient safeguards for bull trout and bull trout habitat.  The Culvert Monitoring Plan requires that culverts be removed or replaced if "found to be in the imminent process of failing."  FS-107736.  In *Flathead I* the Court concluded that the Culvert Monitoring Plan "is reasonable and responsive to the reality of the culvert situation in the Forest," but, nonetheless, the existence of the Culvert Monitoring Plan did not excuse FWS's failure to adequately consider abandonment of the culvert removal requirement.  545 F. Supp. 3d at 870–71.  Defendants attempt to distinguish the present case from *Flathead I* by pointing out that the Revised BiOp now includes the ITS in addition to the Culvert Monitoring Plan.  However, because the ITS only applies to decommissioned roads, the Court fails to see how this distinction makes any difference with respect to culvert removal on impassable roads and the potential impacts to bull trout.  Moreover, the addition of the ITS on remand further underscores the potential adverse impacts of allowing culverts to remain on closed roads, including impassable roads, and the importance of addressing this issue.

Defendants then cite to a number of other guidelines and "components" of the Revised Forest Plan that they argue will collectively serve to protect bull trout. However, Defendants' argument misses the point.  As already explained, Defendants failed to consider the impacts of abandoning the culvert removal requirement with respect to impassable roads and these provisions do not obviate the need to consider this  important aspect of the problem.  Further, the provisions cited by Defendants are discretionary, non-binding, or do not directly address culverts.

Accordingly, Defendants' objections are overruled.  FWS failed to address the impacts of abandoning Amendment 19's culvert removal requirement with respect to impassable roads under the Revised Forest Plan.  FWS violated the ESA because it's decision with respect to this issue was arbitrary and capricious.

### B.    Sedimentation Impacts

Judge DeSoto recommends granting summary judgment in favor of Defendants "insofar as FWS properly addressed sedimentation impacts of unused roads, unauthorized motorized use, and increased roadbuilding."  (Doc. 58 at 46.) Neither party filed objections to Judge DeSoto's findings and recommendation on this issue.  Reviewing for clear error, the Court finds none.

**IV.    Forest Service Reliance on the Revised BiOp**

Judge DeSoto recommends granting summary judgment in favor of Plaintiffs "insofar as the Forest Service relied on the flawed provisions of the Revised BiOP." (Doc. 58 at 46.)  Defendants object and argue that the Court should grant summary judgment for Defendants on all claims, and, therefore, the Forest Service's reliance on the Revised BiOp likewise did not violate the ESA. (Doc. 61 at 19.)  Because the Court has found that Defendants violated the ESA, the Court overrules Defendants' objection.

**V.    Remedy**

Finally, Judge DeSoto recommends "that the provisions of the Revised BiOp that violated the ESA be remanded without vacatur to the agencies for further consideration." (Doc. 58 at 46.)  Judge DeSoto found that remand without vacatur is appropriate because the seriousness of the errors and disruptive consequences disfavor vacatur. (*Id.* at 40–45.)  Plaintiffs object to these findings and recommendation and argue that the relevant factors weigh in favor of remand with vacatur. (Doc. 60 at 22.)  Reviewing de novo, the Court finds that remand without vacatur is the appropriate remedy.

Plaintiffs request targeted, prospective vacatur of specific provisions of the Revised Forest Plan and sections of the Revised BiOp. (Doc. 26 at 2.)

Specifically, Plaintiffs request that the Court vacate the following Revised Forest

Plan provisions:

> Standard FW-STD-IFS-01 to -04; associated Glossary definitions of "decommissioned road," "impassable road," "intermittent stored service/intermittent service road, closed to traffic," "temporary road," "secure core/grizzly bear," and "total motorized route density"; and any other provisions that replace or supersede Amendment 19 to the [1986 Forest Plan].

(Doc. 26 at 2.)  Plaintiffs also request that the Court vacate the following sections

of the Revised BiOp:

> Chapter I, Part E, Subparts 1 (bull trout) and 2 (grizzly bears); Chapter II, Biological Opinion on Bull Trout; Chapter III, Biological Opinion on Grizzly Bears.

(*Id.* at 3.)  Plaintiffs' request for prospective vacatur would permit projects

currently underway or that have received final approval to move forward but

would prohibit approval of any future projects under the Revised Forest Plan as

currently written.

Vacatur is the presumed remedy where an agency has acted unlawfully.  *All.*

*for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018).

However, "the decision to grant or deny injunctive or declaratory relief under the

APA is controlled by principles of equity" and when equity so requires, the

underlying agency action may be "left in place while the agency reconsiders or

replaces the action, or to give the agency time to follow the necessary procedures."

*Id.*  "When determining whether to leave an agency action in place on remand, the

court weighs the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 522 (9th Cir. 2015).

First, Plaintiffs argue that Judge DeSoto erred by discounting the seriousness of the harm resulting from Defendants' unlawful action. (Doc. 60 at 23.) In assessing the seriousness of the errors, the Court must "consider whether vacating a faulty rule could result in possible environmental harm" and "whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council*, 806 F.3d at 532. The Court must also consider whether the errors are "limited in scope and severity." *All. for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156 (D. Mont. 2019).

Plaintiffs identify eight road-building projects that are currently authorized or proposed by the Forest Service under the Revised Forest Plan. (Docs. 60 at 24; 51-1 ¶ 3.) Plaintiffs claim that these projects would collectively result in approximately 44.4 miles of new roads in the Forest and argue that these new roads pose a significant threat of harm to grizzly bears, bull trout, and bull trout critical habitat. (Docs. 60 at 24; 38-1 ¶ 12; 38-2 ¶¶ 3, 8.) Plaintiffs also offer evidence

regarding ineffective road closure devices on the Forest.  (Docs. 60 at 24–25; 38-1 ¶¶ 13–16.)  Plaintiffs further argue that the limited scope of their request mitigates against any potential harm from vacatur, (Doc. 60 at 27), and that FWS's failure to remedy issues identified in *Flathead I* weighs in favor of vacatur, (*id.* at 28–29.)

The Court finds that the potential harm resulting from vacatur outweighs the harm resulting from Defendants' unlawful action.  First and foremost, the errors identified above are significantly limited in scope relative to the entirety of the Revised Forest Plan.  The errors identified above relate primarily to abandonment of Amendment 19's road reclamation requirements.  While these errors are not minor, they do not "compromise the integrity of the Project as a whole."  *Savage*, 375 F. Supp. 3d at 1156; *see also Flathead I*, 545 F. Supp. 3d at 884.  Furthermore, the Court is not persuaded by Plaintiffs' "second bite at the apple" argument. While it is true that this is FWS's second opportunity to remedy errors in its biological opinion for the Revised Forest Plan, the errors identified by the Court here are not entirely identical to those identified in *Flathead I* and the agency has made significant additions to its biological opinion on remand.  Additionally, the Court's analysis relies, in part, on case law that was developed after the Revised BiOp was published; specifically, *Knotty Pine* and *Marten* which were decided in 2023.  Additionally, although the agency is not likely to reach the exact same decision following remand, the agency is not likely to reach a different result on

the Revised Forest Plan as a whole.  Finally, vacatur could result in environmental harm by disrupting administration of the Revised Forest Plan as a whole, as addressed in more detail below.

Although Plaintiffs argue, somewhat convincingly, that the targeted nature of the request tips these factors in favor of vacatur, the Court is not convinced that such piecemeal vacatur can be achieved while allowing effective implementation of the Revised Forest Plan due to the administrative complexities that would result. While at face value it may appear that Amendment 19's provisions could easily be substituted for the existing provisions identified by Plaintiffs, the Court gives significant consideration to Defendants' position that the Revised Forest Plan is a "cohesive unit" that cannot be easily picked apart and altered.

In their second objection, Plaintiffs argue that Judge Desoto erred in finding that vacatur would result in serious disruptive consequences.  (Doc. 60 at 31.) Relevant considerations include the economic impacts of vacatur, as well as the disruptive effects on the environment, local communities, and wildlife.  *Savage*, 375 F. Supp. 3d at 1157.  Plaintiffs argue that the three projects that would be affected by vacatur—the Mid-Swan Project, Dry Riverside Project, and Rumbling Owl Project—have not yet been approved by the Forest Service, and therefore any "disruption" is speculative.  (Doc. 60 at 31.)  Second, Plaintiffs argue that any disruption would be limited because Defendants would likely be able to satisfy the

remand order expeditiously, as they did following remand in *Flathead I*.  (*Id.* at 33.)  Finally, Plaintiffs argue that there would actually be an economic benefit from reinstating Amendment 19 in lieu of the challenged provisions.  (*Id.*)

As already discussed, the targeted vacatur sought by Plaintiffs is likely to be disruptive due to the integrated nature of the Revised Forest Plan.  As explained by Defendants, "partial vacatur would limit the Forest Service's ability to meet some of the ecosystem services and multiple uses, which are integrated with Plan components for wildlife."  (Docs. 63 at 22; 64 ¶ 7.)  Moreover, Defendants explain that even partial vacatur would be "administratively unwieldly because the Forest Service would need to re-evaluate the overarching plan for managing the [Forest] and the additional administrative process could include the development of a new Record of Decision."  (Docs. 63 at 22; 64 ¶ 7.)  In other words, even partial vacatur could result in much broader consequences than anticipated by Plaintiffs.  Regarding the three projects identified by Plaintiffs, it appears that the Forest Service has already elected not to move forward in anticipation of remand  (Doc. 63 at 23; 64 ¶ 6.)  As such, this argument does not weigh for or against vacatur.  Finally, the Court is unpersuaded by Plaintiffs' speculatory argument that satisfaction of the remand order would be expeditious or that reinstatement of Amendment 19 at this time would result in greater economic benefit.

In conclusion, Plaintiffs' objections are overruled.  The Court concludes that remand without vacatur is the appropriate remedy.

CONCLUSION

The Court overrules Defendants' objections regarding unauthorized motorized access, culvert removal, and the Forest Service's reliance on the flawed BiOp.  The Court grants Plaintiffs' objection regarding unused roads and overrules Plaintiffs' objection regarding vacatur.  The Court also modifies a portion of Judge DeSoto's findings regarding unauthorized motorized use.

Accordingly, IT IS ORDERED that the Findings and Recommendations (Doc. 58) are ADOPTED IN PART, MODIFIED IN PART, and REJECTED IN PART, as discussed above.

IT IS FURTHER ORDERED that Defendants' Motion to Strike (Doc. 47) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Leave to File Third Hammer Declaration (Doc. 51) is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 26) is GRANTED IN PART and DENIED IN PART as follows:

1) Plaintiffs are entitled to summary judgment on their ESA claims regarding grizzly bears insofar as FWS failed to address the exclusion of unauthorized motorized use from road density calculations and, to the

48

extent the agency did address this issue, failed to articulate a satisfactory explanation regarding its decision;

2) Plaintiffs are entitled to summary judgment on their ESA claims regarding grizzly bears insofar as FWS offered an explanation for its decision to exclude impassable roads from TMRD that runs counter to the evidence before the agency;

3) Plaintiffs are entitled to summary judgment on their ESA claims regarding bull trout and bull trout critical habitat insofar as FWS failed to address its decision to abandon the culvert removal requirement with respect to impassable roads;

4) Plaintiffs are entitled to summary judgment on their ESA claims insofar as the Forest Service relied on the flawed provisions of the Revised BiOp.

IT IS FURTHER ORDERED that Defendants' cross-motion for summary judgment (Doc. 29) is GRANTED IN PART and DENIED IN PART.  Defendants are entitled to summary judgment on all remaining claims.

IT IS FURTHER ORDERED that the provisions of the Revised BiOp that have been found to violate the ESA are REMANDED WITHOUT VACATUR to the agencies for further consideration consistent with this opinion.

DATED this 28th day of June, 2024.

49

Dana L. Christensen, District Judge
United States District Court